[No. 40403-6-II.   Division Two.   December 8, 2011.]

THE STATE OF WASHINGTON, *Respondent*, v. SHAWNY L. BERTRAND, *Appellant*.

394

*Thomas M. Kummerow* (of *Washington Appellate Project*), for appellant.

*Jonathan L. Meyer, Prosecuting Attorney*, and *Sara I. Beigh, Deputy*, for respondent.

¶1 HUNT, J. — Shawny L. Bertrand appeals the trial court's imposition of legal financial obligations (LFOs) and an enhanced sentence following her jury conviction for delivering a controlled substance (oxycodone). RCW 69.50-.401(2)(a). For the first time on appeal, she argues that (1) the unanimity language in the special verdict jury instruction, asking whether she delivered a controlled substance within 1,000 feet of a designated school bus stop (RCW 69.50.435), was error, citing *Bashaw*;[1] and (2) the record is insufficient to support the trial court's imposition of LFOs, especially its finding that she had the present or future ability to pay. We affirm Bertrand's enhanced sentence because she did not preserve the special verdict unanimity instruction challenge below and she does not raise a manifest error implicating a specifically identified constitutional right that she may raise for the first time on appeal under RAP 2.5(a)(3). We also affirm the trial court's imposition of LFOs, but we reverse and remand to the trial court to vacate its unsupported finding that Bertrand has the current or future ability to pay these LFOs.

---

[1] *State v Bashaw*, 169 Wn.2d 133, 234 P.3d 195 (2010). Bertrand also refers to an error in jury instruction "16" and to a "firearm" sentencing enhancement. Br. of Appellant at 4. This case did not involve a firearm and contained only 13 jury instructions. It appears that Bertrand meant to cite jury instruction 13 and to refer to a school bus stop sentencing enhancement.

## FACTS

### I. CONTROLLED DRUG BUY

¶2 In late March 2009, an informant working for the Centralia Police Department made a "controlled buy"[2] of prescription oxycodone pills from Shawny Lee Bertrand. Verbatim Report of Proceedings (VRP) (Jan. 13, 2010) at 28. The informant wore a court-approved wire device and tape recorded the drug purchase. The informant drove to Bertrand's home and knocked on the front door; Bertrand's mother let him inside. Finding Bertrand asleep, the informant woke her and explained that he had $300 for 15 oxycodone pills. Bertrand retrieved her prescription pill bottle, counted out 15 pills, and exchanged the pills for the informant's $300. The informant left Bertrand's home, returned to the police station, and turned the purchased drugs over to the police, who then completed standard "controlled buy" procedures.[3] VRP (Jan. 13, 2010) at 38.

### II. PROCEDURE

¶3 The State charged Bertrand with unlawfully delivering a controlled substance (oxycodone) on or about March 23, 2009, and alleged that the sale had occurred within 1,000 feet of a designated school bus stop as the basis for an enhanced sentence under RCW 69.50.435. At Bertrand's January 2010 trial, the Centralia School District's assistant transportation director, Dale Dunham, testified that in

[2] Generally, a "controlled buy" is a police operation where an informant and any vehicle being used is searched before a scheduled drug purchase to ensure that the informant does not have any drugs, weapons, or personal money available for use. The informant then receives prerecorded or otherwise traceable money from the police, purchases drugs while under police surveillance, and turns the drugs and any money over to the police. The informant and any vehicle used are immediately searched again after the drug purchase.

[3] Because Bertrand was evicted from her home shortly after the "controlled buy," no search warrant was issued and the police never recovered the money that the informant used to buy the oxycodone from Bertrand. VRP (Jan. 13, 2010) at 38.

March 2009, a designated, actively used school bus stop existed at the corner of "Ives and Lamar." VRP (Jan. 13, 2010) at 76. A City of Centralia engineer technician testified that this bus stop was 883.71 feet from Bertrand's home. This evidence was uncontroverted.

¶4 Bertrand and her family members testified that the drug sale allegation was false and that the informant usually stopped by Bertrand's residence to see her daughter's boyfriend. Bertrand acknowledged that she had a prescription for oxycodone in March 2009. But she contended that, during an earlier visit, the informant had planted the oxycodone pills at issue here to fulfill his police informant obligations and to better his position in his own legal proceedings. The State countered that none of the defense witnesses' testimonies could explain the informant's tape-recorded purchase of the oxycodone from Bertrand.

¶5 Apparently the State, Bertrand, and the trial court proposed jury instructions. Bertrand did not object to any of the trial court's jury instructions. Jury instruction 13 explained the jury's duties for considering the school-bus-stop special verdict:

> If you find the defendant guilty of Delivery of a Controlled Substance as charged in Count I, it will then be your duty to determine whether or not the defendant delivered the controlled substance to a person within one thousand feet of a school bus route stop designated by a school district. You will be furnished with a special verdict form for this purpose.
>
> If you find the defendant not guilty of Delivery of a Controlled Substance, do not use the special verdict form. If you find the defendant guilty, you will complete the special verdict. *Since this is a criminal case, all twelve of you must agree on the answer to the special verdict.*
>
> If you find from the evidence that the state has proved beyond a reasonable doubt that the defendant delivered the controlled substance to a person within one thousand feet of a school bus route stop designated by a school district, it will be your duty to answer the special verdict "yes".

On the other hand, if, after weighing all of the evidence, you have a reasonable doubt that the defendant delivered the controlled substance to a person within one thousand feet of a school bus route stop designated by a school district, it will be your duty to answer the special verdict "no".

Clerk's Papers (CP) at 33 (Instruction 13) (emphasis added). Bertrand neither objected nor proposed changes to this instruction.[4]

¶6 The jury found Bertrand guilty of delivering a controlled substance and answered, "Yes," on the special verdict form, finding that Bertrand had made this delivery within 1,000 feet of a designated school bus stop, in violation of RCW 69.50.435. CP at 35. Both the State and Bertrand declined the trial court's offer to poll the jury about its unanimous verdicts.

¶7 On February 9, 2010, the trial court sentenced Bertrand to 36 months and 1 day of confinement, which included 24 months for the school-bus-stop sentencing enhancement and 12 months of community custody. The trial court also (1) found that Bertrand had the ability, or likely would have the ability in the future, to pay LFOs; (2) imposed a total of $4,304 in LFOs; (3) set Bertrand's minimum monthly payment at $25; and (4) scheduled payment obligations to begin 60 days from the date of the judgment and sentence. Bertrand did not object to the imposition of LFOs at sentencing; nor did she assert that, as a disabled person, she lacked the financial ability to pay.

¶8 Bertrand appeals the imposition of LFOs and the jury's special verdict finding that the drug delivery occurred within 1,000 feet of a school bus stop.[5]

---

[4] Bertrand's trial concluded before the Washington Supreme Court issued *Bashaw* on July 1, 2010, holding that this type of special verdict unanimity instruction is error.

[5] Bertrand does not appeal her unlawful controlled substance delivery conviction.

## ANALYSIS

### I. Special Verdict Unanimity Instruction

¶9  For the first time on appeal, Bertrand challenges the trial court's special verdict jury unanimity instruction. Citing *Bashaw* and *State v. Goldberg*, 149 Wn.2d 888, 72 P.3d 1083 (2003), Bertrand argues that the trial court misstated the law by instructing the jury that it had to be unanimous to enter a "no" finding on the special verdict form asking whether she delivered the controlled substance within 1,000 feet of a school bus stop. Br. of Appellant at 4. The State responds that (1) Bertrand did not preserve this error for review,[6] (2) the instructional error implicates no constitutional right, and (3) Bertrand cannot identify a "manifest" practical and identifiable consequence resulting from this instructional error. Br. of Resp't at 5.

¶10  Agreeing with the State, we hold that Bertrand cannot raise her jury instruction challenge for the first time on appeal because the alleged error is neither constitutional nor "manifest." In the alternative, because Bertrand never disputed the location of the delivery, and the uncontroverted evidence in the record indicates that the delivery occurred within 1,000 feet of a school bus stop, we further hold that any error in the school-bus-stop enhancement special verdict jury instruction was harmless beyond a reasonable doubt.

### A. Failure To Preserve Error for Appeal

¶11  At the outset, we note that Bertrand did not comply with CrR 6.15(c) when she failed to object to the

---

[6] Because we hold that Bertrand does not meet the RAP 2.5(a)(3) manifest constitutional error exception to the general rule requiring appellants to preserve errors for review by objecting below, we need not address the State's alternative argument that Bertrand waived any jury instructional errors by not proposing her own jury instructions at trial.

trial court's special verdict unanimity jury instruction. CrR 6.15(c) requires timely and well-stated objections to jury instructions " 'in order that the trial court may have the opportunity to correct any error.' " *State v. Scott*, 110 Wn.2d 682, 685-86, 757 P.2d 492 (1988) (quoting *City of Seattle v. Rainwater*, 86 Wn.2d 567, 571, 546 P.2d 450 (1976)). In failing to object below, Bertrand did not give the trial court an opportunity to correct this instructional error; thus, she has not preserved this error for appeal.

### B. Failure To Meet RAP 2.5(a)(3) Manifest Constitutional Error Exception Test

█ ¶12 Notwithstanding Bertrand's failure to preserve this issue below, she contends that she can challenge this instructional error for the first time on appeal. We disagree. Bertrand does not show that the instructional error falls within the following RAP 2.5(a)(3) exception to the general error-preservation rule for appeals:

> The appellate court may refuse to review any claim of error which was not raised in the trial court. However, a party may raise the following claimed errors for the first time in the appellate court: . . . manifest error affecting a constitutional right.

As we recently held in *State v. Grimes*,[7] for this RAP 2.5(a)(3) exception to apply, an appellant must show both that (1) the error implicates a specifically identified constitutional right, and (2) the error is "manifest" in that it had "practical and identifiable consequences" in the trial below.[8] *See Grimes*, 165 Wn. App. at 185-87 (quoting *State v. O'Hara*, 167 Wn.2d 91, 98, 217 P.3d 756 (2009)).

---

[7] *State v. Grimes*, 165 Wn. App. 172, 267 P.3d 454 (2011).

[8] According to our Supreme Court's most recent pronouncement, the determination of whether an error is "manifest" requires an appellant to show "actual prejudice," which we determine by looking at the asserted error to see if it had " 'practical and identifiable consequences' " at trial. *State v. Gordon*, 172 Wn.2d 671, 676, 260 P.3d 884 (2011) (internal quotation marks omitted) (quoting *State v. O'Hara*, 167 Wn.2d 91, 99, 217 P.3d 756 (2009)). This "actual prejudice" language has frustrated and confused lawyers, clerks, and judges for years because the term

¶13 If an appellant successfully shows that the error is both constitutional in magnitude and "manifest," in that it had practical and identifiable consequences below, the burden then shifts to the State "to prove that the error was harmless . . . under the *Chapman* standard"[9] beyond a reasonable doubt. *Grimes*, 165 Wn. App. at 186 (footnote

of art "actual prejudice" involves a different balance than does a harmless error analysis, which determines whether reversal is warranted. *See O'Hara*, 167 Wn.2d at 99; *Grimes*, 165 Wn. App. at 187 n.16.

We agree with our concurring colleague's explanation of the evolution of the term "manifest error" and her comment that our state's previous case law has sometimes involved circular reasoning when defining "manifest error" for purposes of the RAP 2.5(a)(3) exception. Some cases, for example, have conflated prejudice and harmless error determinations into what should have been a preliminary determination of whether the asserted error was "manifest." *See State v. Powell*, 166 Wn.2d 73, 84-85, 206 P.3d 321 (2009) (holding that an alleged ER 404(b) error was not of constitutional magnitude but also indicating it was "dubious whether the error was manifest" where the error did not have a practical and identifiable consequence in the trial because "the jury had ample testimony . . . to support its guilty verdict"); *State v. Kirkpatrick*, 160 Wn.2d 873, 881, 161 P.3d 990 (2007) (holding an unlawful seizure claim constitutional, but not "manifest," because "[t]he record [was] insufficient to determine any practical consequences of the admission of [Kirkpatrick's] statements on the outcome of [his] trial given other, unchallenged evidence of his guilt").

We also note that the reasoning in *Powell* and *Kirkpatrick* appears to conflict with the reasoning in *O'Hara*, a case in which our Supreme Court admonished, "The determination of whether there is actual prejudice," and, therefore, whether an error is "manifest,"

is a different question and involves a different analysis as compared to the determination of whether the error warrants reversal. In order to ensure the actual prejudice and harmless error analyses are separate, the focus of the actual prejudice must be on whether the error is so obvious on the record that the error warrants appellate review.

*O'Hara*, 167 Wn.2d at 99-100. Our state's shift away from the long standing meaning of "manifest" has led to these different interpretations of "manifest"; and, as our concurring colleague carefully documents, this confusion has led to increased appellate review of unpreserved errors.

Despite our agreement with most of the concurrence's logic, stare decisis prevents our adopting it. Changing the definition of "manifest error" back to its plain meaning for the limited purpose of the RAP 2.5(a)(3) exception is the exclusive province of our Supreme Court. Thus, we respectfully disagree with the concurrence's assertion that the *Bashaw* error here was "manifest." In our view, this assertion directly conflicts with our Supreme Court's recent decision in *Gordon* and its earlier decisions addressing the meaning of "manifest error" in the context of allowing an appellant to raise for the first time on appeal a constitutional error that she did not raise below at trial. *See, e.g., O'Hara*, 167 Wn.2d at 99; *State v. Kirkman*, 159 Wn.2d 918, 935, 155 P.3d 125 (2007).

[9] *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967).

omitted) (citing *State v. Gordon*, 172 Wn.2d 671, 676 n.2, 260 P.3d 884 (2011)). We follow and incorporate here this three-part test that we recently laid out in greater detail in *Grimes*.

■ ¶14 As we held in *Grimes*, the instructional error Bertrand attempts to raise here is not a constitutional error.[10] *Grimes*, 165 Wn. App. at 188-89 (citing *State v. Morgan*, 163 Wn. App. 341, 351-52, 261 P.3d 167 (2011); *State v. Guzman Nunez*, 160 Wn. App. 150, 159, 248 P.3d 103, *review granted*, 172 Wn.2d 1004 (2011)). Bertrand having failed to identify how the challenged instruction implicates a constitutional right, she fails to meet the first part of the test to qualify for the RAP 2.5(a)(3) exception. She also fails to meet the second part of the test because she neither argues nor shows that the instructional error was "manifest": she fails to identify a "practical and identifiable consequence" at trial. *Grimes*, 165 Wn. App. at 189-90 (citing *O'Hara*, 167 Wn.2d at 99-100).

¶15 Because Bertrand carries neither of her two burdens necessary to trigger our limited discretion under RAP 2.5(a)(3) to entertain her nonpreserved claim of error,[11] we

---

[10] As we explained in detail in *Grimes*, although the Supreme Court held in *Bashaw* that a similar instruction was error, the Court neither addressed nor held that this error was constitutional. *Grimes*, 165 Wn. App. at 181-82.

[11] Another consequence of Bertrand's failure to carry her two burdens is that the burden does not shift to the State to prove that the alleged error was harmless beyond a reasonable doubt. Nevertheless, we note that, even if the burden were to shift to the State, it clearly would be able to show that the special verdict unanimity instructional error was harmless beyond a reasonable doubt. Jury instruction errors are harmless if the reviewing court can conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error. *Bashaw*, 169 Wn.2d at 147. Here, in contrast with the disputed facts in *Bashaw*, the evidence establishing distance was uncontroverted; moreover, it was supported by competent physical evidence and testimonial evidence, not mere speculation, as was the case in *Bashaw*.

Furthermore, again, unlike Bashaw, Bertrand never challenged that the school bus stop was not within 1,000 feet of her house; nor did she present conflicting evidence. On the contrary, she argued only that the informant had planted the oxycodone in her home, not that her home was more than 1,000 feet from a school bus stop. Thus, we can say beyond a reasonable doubt that the instructional error had no effect on the jury's special verdict.

need not address the merits of her instructional challenge for the first time on appeal.[12] *See Scott*, 110 Wn.2d at 687.

## II. LEGAL FINANCIAL OBLIGATIONS

¶16 Bertrand next challenges the trial court's imposing LFOs as part of her sentence. More specifically, she argues that (1) the record does not support the trial court's finding that she either has or in the future will have the ability to pay LFOs; and (2) this finding violates her equal protection rights because she is disabled and unable to pay. The State counters that (1) Bertrand's challenge is not ripe because it has not yet sought enforcement of LFO payments; and (2) in the alternative, the trial court imposed LFOs within its statutory authority. We agree with Bertrand that the record does not support the trial court's finding that she has or will have the ability to pay these LFOs when and if the State attempts to collect them.

## A. Finding of Ability To Pay LFOs

¶17 Bertrand assigns error to the trial court's judgment and sentence "finding" that she has the current or future ability to pay LFOs. Br. of Appellant at 7. Citing *State v. Baldwin*, she contends that the ripeness test does not apply to her challenge to the trial court's factual findings and that we should review this challenge under the clearly erroneous

---

[12] Even if we were to address this issue, Bertrand's arguments would fail. See our analysis in *Grimes*, 165 Wn. App. at 178-88, including our discussion of Divisions One and Three cases addressing this subject and the Supreme Court's recent acceptance of a petition for review to consider whether this special verdict unanimity instructional error is of constitutional magnitude. As we note in *Grimes*, however, even if the Supreme Court ultimately holds that this instructional error is constitutional, an appellate court must still apply the next two steps of the RAP 2.5(a)(3) test before holding that the error warrants reversal. *Grimes*, 165 Wn. App. at 185-86. And, as we note in the preceding footnote, such a holding would not be possible here under the third, harmless error prong of the test. *See also Grimes*, 165 Wn. App. at 190-91.

standard.[13] *See* Reply Br. of Appellant at 4-5 (citing *State v. Baldwin*, 63 Wn. App. 303, 312, 818 P.2d 1116, 837 P.2d 646 (1991)). We agree with Bertrand that the trial court's finding that she had the ability to pay these LFOs was clearly erroneous because it lacks support in the record.

¶18 Bertrand assigns error to the trial court's judgment and sentence finding number 2.5:

> "The court has considered the total amount owing, the defendant's past, present, and future ability to pay financial legal obligations, including the defendant's financial resources and the likelihood that the defendant's status will change. *The court finds:*
>
> *"That the defendant has the ability or likely future ability to pay the legal financial obligations imposed herein.* RCW 9.94A.753."

Br. of Appellant at 9 (emphasis added) (quoting CP at 37).

¶19 Although *Baldwin* does not require formal findings of fact about a defendant's present or future ability to pay LFOs,[14] the record must be sufficient for us to review whether "the trial court judge took into account the financial resources of the defendant and the nature of the burden" imposed by LFOs under the clearly erroneous standard. *Baldwin*, 63 Wn. App. at 312. The record here does not show that the trial court took into account Bertrand's financial resources and the nature of the burden of imposing LFOs on her. In fact, the record before us on appeal contains no evidence to support the trial court's finding number 2.5 that Bertrand has the present or future ability to pay LFOs.[15] Therefore, we hold that the trial court's judgment and sentence finding number 2.5 was clearly erroneous.

---

[13] The trial court's determination "as to the defendant's resources and ability to pay is essentially factual and should be reviewed under the clearly erroneous standard." *Baldwin*, 63 Wn. App. at 312.

[14] *Baldwin*, 63 Wn. App. at 311.

[15] On the contrary, in light of Bertrand's disability, her ability to pay LFOs now or in the near future is arguably in question.

## B. Ripeness

¶20  We next address whether Bertrand's challenge to the imposition of LFOs is ripe for our review. *Baldwin* holds that "the meaningful time to examine the defendant's ability to pay is *when the government seeks to collect the obligation.*" *Baldwin*, 63 Wn. App. at 310 (emphasis added) (citing *State v. Curry*, 62 Wn. App. 676, 680, 814 P.2d 1252 (1991)). The *Baldwin* court further noted:

> The defendant may petition the court at any time for remission or modification of the payments on [the basis of manifest hardship]. Through this procedure the defendant is entitled to *judicial scrutiny* of his obligation and *his present ability to pay at the relevant time.*

*Baldwin*, 63 Wn. App. at 310-11 (emphasis added) (footnote omitted).

¶21  Although the trial court ordered Bertrand to begin paying her LFOs within 60 days of the judgment and sentence, our reversal of the trial court's judgment and sentence finding 2.5 forecloses the ability of the Department of Corrections to begin collecting LFOs from Bertrand until after a future determination of her ability to pay. Thus, because Bertrand can apply for remission of her LFOs when the State initiates collections, we do not further address her LFO challenge.

¶22  We affirm Bertrand's enhanced sentence and the trial court's imposition of LFOs. We reverse the trial court's finding that Bertrand has the present or future ability to pay LFOs and remand to the trial court to strike finding number 2.5 from the judgment and sentence.[16]

VAN DEREN, J., concurs.

---

[16] We further note that, after the trial court on remand strikes its finding that Bertrand has the present or future ability to pay her LFOs, before the State can

¶23 Quinn-Brintnall, J. (concurring) — Although I agree with the result reached by my colleagues, I write separately to address the state of RAP 2.5(a)(3) analysis in Washington jurisprudence. Many conflicting recent opinions address what constitutes a "manifest error affecting a constitutional right" such that the error need not be preserved in the trial court but may be raised for the first time on appeal. In my opinion, these cases mistakenly seek to interpret a phrase that is clear on its face and should not be interpreted by the very courts whose jurisdiction the rule limits.

HISTORY OF REVIEWING ERRORS RAISED FOR THE FIRST TIME ON APPEAL

¶24 Appellate courts in this country do not generally review errors raised for the first time on appeal. As long-time First Circuit Judge Frank Coffin eloquently noted,

[A]ppellate courts in civil law jurisdictions will review issues of fact with little deference to trial court findings and will even receive new evidence. . . . But in the United States . . . the ancient writ-of-error way of thinking still holds sway—the concept that the target of an appeal is the alleged error(s) of the trial judge, not whether a fresh view of facts and legal issues would command a different result. Consequently, our appellate courts step into the shoes of the trial judge and view the facts and issues as they were presented to him.

But there is more than history and tradition supporting our adherence to the record made below. There is an instinct of fairness due both the trial judge or agency and a litigant's adversary, a sense that one's opponent should have a chance to defend, explain, or rebut some challenged ruling and that the trial judge should have a clear first chance to address the issue. Indeed, if appellate courts were to consider some unpreserved issues but not others, depending on gradations of sympathy, the result would be an extremely uneven playing field.

collect LFOs from Bertrand, there must be a determination that she has the ability to pay these LFOs, taking into account her resources and the nature of the financial burden on her. *See Baldwin*, 63 Wn. App. at 312; RCW 9.94A.753; former RCW 9.94A.760 (2008); former RCW 10.01.160 (2008); RCW 10.46.190.

There is also the canny recognition that if late-blooming issues were allowed to be raised for the first time on appeal, this would be an incentive for game-playing by counsel, for acquiescing through silence when risky rulings are made, and, when they can no longer be corrected at the trial level, unveiling them as new weapons on appeal. Finally, there is an element of institutional self-preservation in closing the door to what could be a flood of open-ended appellate opportunities.

FRANK M. COFFIN, ON APPEAL: COURTS, LAWYERING, AND JUDGING 84-85 (1994). In accord with Judge Coffin's sentiments, Washington has long recognized the fundamental fairness of requiring parties to preserve issues they wish to present to the appellate courts for review.

¶25 For instance, in 1861, when "Washington" still included the whole of Idaho and parts of Colorado and Montana, the Supreme Court of the Washington Territory decided *Blumberg v. McNear*, 1 Wash. Terr. 141 (1861). In this wharfage case, Blumberg petitioned for a mistrial because the trial court refused to give his proposed jury instructions. Justice Oliphant's opinion noted,

These instructions are not properly before the Court, not having been excepted to at the time. When a party wishes the action of the Court below to be reviewed upon a writ of error, for refusing or granting a new trial — to the admission or rejection of evidence — refusing to give instructions prayed for — or to the charge of the Court, *he must except or object, as the case may be, at the time, and have the same noted by the Judge, or else they will not be regarded by the Supreme Court.*

*Blumberg*, 1 Wash. Terr. at 141-42 (emphasis added).

¶26 Thus, 115 years before the adoption of RAP 2.5(a)(3), absent a contemporaneous objection at trial, an appellate court could not properly review an assignment of error. And, although the *Blumberg* court did not address whether an appellate court could review a manifest error raised for the first time on appeal, in *Williams v. Ninemire*, 23 Wash. 393, 63 P. 534 (1900), the court did review an erroneous jury instruction not objected to at trial that, in effect, directed a

verdict against the appellant. Thus, the exception allowing review of an error raised for the first time on appeal for "manifest error affecting a constitutional right" existed long before the adoption of RAP 2.5(a)(3).

¶27 Between *Blumberg* in 1861 and the adoption of RAP 2.5(a)(3) in 1976, the Washington Supreme Court handed down over 50 cases that in one way or another, addressed "manifest error." And although research reveals that these cases use the term without defining it, *Black's Law Dictionary* dates the first English usage of "manifest error" to the 18th century and describes it as "[a]n error that is plain and indisputable, and that amounts to a complete disregard of the controlling law or the credible evidence in the record." BLACK'S LAW DICTIONARY 622 (9th ed. 2009). Review of over 100 years of Washington jurisprudence confirms this.

¶28 In the case of *State v. Phillips*, 59 Wash. 252, 259, 109 P. 1047 (1910), for instance, the Supreme Court stated,

> The aid of counsel is guaranteed by the constitution to every person accused of crime, and this is universally recognized as one of the surest safeguards against injustice and oppression. Any conduct or statement on the part of the court that tends to impair the influence or destroy the usefulness of counsel is palpable and manifest error.

And in *Sawdey v. Spokane Falls & Northern Railway*, 27 Wash. 536, 538-39, 67 P. 1094 (1902), the pervasive usage of the term is made clear:

> And, in support of their position, [counsel argues] that an assignment of error is an assignment of ignorance, for error implies ignorance; that to charge gross, palpable, or manifest error,—*terms which are commonly found in briefs filed in appellate courts*,—is to charge uncommon error, which is uncommon ignorance; and that to say that the action of the court was an "extrajudicial assumption of power" was to say that the judge assumed to decide that which did not belong to the judge to determine.

(Emphasis added.) In *McLain v. Easley*, 146 Wash. 377, 381-82, 264 P. 714 (1928), the Supreme Court went so far

as to recognize *its own manifest error* on a motion for reconsideration:

> Our attention is now called to a manifest error, inadvertently made, in the remanding of the case to the superior court and directing the entry of judgment upon the verdict rendered in favor of appellants. There had been made by respondents in the superior court, not only a motion for judgment notwithstanding the verdict, which motion was granted, but also, in the alternative, a motion for new trial, which was not disposed of; this because there was no occasion for the court considering the motion for a new trial after granting the motion for judgment notwithstanding the verdict. This condition of the record was overlooked in the Departmental decision. It is plain, *under our previous holdings*, that upon the reversal of the judgment notwithstanding the verdict, there being a motion for new trial undisposed of, the case should have been remanded to the superior court for disposition of that motion and for further proceedings.

(Emphasis added.)

¶29 Clearly, history reveals that the "manifest error" standard—at least in relation to obvious departures from controlling law—has long precedence in Washington. Thus, it is unsurprising that, in 1976, Washington rejected the federal courts' more expansive "plain error rule" in favor of this state's longstanding "manifest error" jurisprudence.

The Federal Plain Error Rule

¶30 In November 1972, the United States Supreme Court proposed that federal courts adopt the final version of the Federal Rules of Evidence drafted by the Advisory Committee on Rules of Evidence.[17] 56 F.R.D. 183, 184 (1973). The final version of Fed. R. Evid. 103 reads, in part,

---

[17] The Chief Justice of the Supreme Court may appoint such committees pursuant to 28 U.S.C. § 331. In 1965, an Advisory Committee on Rules of Evidence began drafting uniform evidentiary rules for the federal court system. 46 F.R.D. 161, 171-81 (1969). Of note, the minutes from the August 1968 committee meeting reveal that significant debate occurred as to whether a provision should be included in the evidentiary rules addressing judicial notice of plain errors not

**(a) Effect of erroneous ruling.** Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and

(1) *Objection.* In case the ruling is one admitting evidence a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context; or

(2) *Offer of proof.* In case the ruling is one excluding evidence, the substance of the evidence was made known to the judge by offer or was apparent from the context within which questions were asked.

. . . .

**(d) Plain error.** Nothing in this rule precludes taking notice of plain errors affecting substantial rights although they were not brought to the attention of the judge.

56 F.R.D. at 194-95. The notes accompanying these sections of Fed. R. Evid. 103 stated,

**Subdivision (a)** states the law as generally accepted today. Rulings on evidence cannot be assigned as error unless (1) a substantial right is affected, and (2) the nature of the error was called to the attention of the judge, so as to alert him to the proper course of action and enable opposing counsel to take proper corrective measures. The objection and the offer of proof are the techniques for accomplishing these objectives. . . . The rule does not purport to change the law with respect to harmless error. See 28 USC § 2111, F.R.Civ.P. 61, F.R.Crim.P.

---

brought to the attention of the trial court and, if so, how that language should read:

Mr. Berger then drew the attention of the members to Rule 52 of the Federal Rules of Criminal Procedure. He read subsection (a) Harmless error and subsection (b) Plain error. Judge Sobeloff asked why not adopt that exact language. Mr. Berger stated that in Criminal Rules if an error affected a substantial right, it did not have to be brought to the attention of the court. Mr. Williams stated that that language would be subject to abuse. . . . Professor Cleary suggested inserting in the Note that a *"Constitutional error is a plain error."* Mr. Spangenberg then suggested striking subsection (d). *His reason was that it was a rule of appellate procedure.* . . . Professor Cleary then suggested that "Nothing in this rule precludes consideration of constitutional error."

*Minutes of the August 1968 Meeting of the Advisory Committee on Rules of Evidence,* FED. EVIDENCE REVIEW 12 (Aug. 8-10, 1968), http://federalevidence.com/pdf/FRE_Amendments/Pre1975/EV08-1968-min.pdf (emphasis added).

52, and decisions construing them. The status of constitutional error as harmless or not is treated in Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), reh. denied *id.* 987, 87 S.Ct. 1283, 18 L.Ed.2d 241.

. . . .

**Subdivision (d).** This wording of the plain error principle is from Rule 52(b) of the Federal Rules of Criminal Procedure. While judicial unwillingness to be constricted by mechanical breakdowns of the adversary system has been more pronounced in criminal cases, there is no scarcity of decisions to the same effect in civil cases. . . . In the nature of things the application of the plain error rule will be more likely with respect to the admission of evidence than to exclusion, since failure to comply with normal requirements of offers of proof is likely to produce a record which simply does not disclose the error.

56 F.R.D. at 195-96. In January 1975, Congress promulgated the Federal Rules of Evidence. Pub. L. No. 93-595, 88 Stat. 1926 (1975). Fed. R. Evid. 103 and its accompanying notes did not change.

¶31 The federal evidentiary rules, however, had no binding authority on state courts. Accordingly, in 1976, the Washington Supreme Court "codified" what it intended to be a *more restrictive* rule related to raising an issue for the first time on appeal—RAP 2.5(a)(3). Importantly, although the comments accompanying the rule explicitly related RAP 2.5(a)(3) to usage in federal practice, and implicitly (in reference to the New Jersey rule) to the plain error standard, they reemphasized that such review should be limited solely to constitutional questions: "Exception (3) is intended to encompass developing case law. Thus, certain constitutional questions can be raised for the first time on review. . . . It is derived from New Jersey Rule 2:10-2 and conforms to federal practice. *Fleming v. Goodwin*, 165 F.2d

334 (8th Cir. 1948)." RAP 2.5 cmt. (a) at 86 Wn.2d 1152 (1976).[18]

¶32  The court adopted the "manifest error" terminology when promulgating RAP 2.5(a)(3), rather than the more common "plain error" standard, in an effort to limit appellate review of unpreserved error to instances where an appellant's constitutional rights were in jeopardy, and deliberately chose the well-understood and long-standing "manifest error" language to avoid confusion with the more expansive "plain error" standard.[19]

---

[18] The New Jersey rule reads, "Any error or omission shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result, but the appellate court may, in the interests of justice, notice plain error not brought to the attention of the trial or appellate court." N.J. Ct. R. 2:10-2. The *Fleming* reference likely refers to the following language in that case: "Ordinarily this Court will not consider a question which was not presented to or passed upon by the District Court . . . but this rule does not preclude the Court from correcting a plain error, particularly in a case in which the public interest is involved." 165 F.2d at 337.

[19] Washington's own Rules of Evidence bolster this view. Although the Washington Supreme Court acquiesced to the adoption of most of the Fed. R. Evid. in 1979, the court took special exception to Fed. R. Evid. 103(d) as evinced by our "version" of the rule: "**[103](d) Errors Raised for the First Time on Review**. [Reserved—*See* RAP 2.5(a)]." ER 103, at 91 Wn.2d 1123 (1979). The comment following the rule explains,

*Section (d)*. Federal Rule 103(d), Plain error, is deleted. The Washington Supreme Court recently codified the extent to which an error may be asserted for the first time in an appellate court. *See* RAP 2.5(a). Rule 103(d) defers to the Rules of Appellate Procedure and the decisions construing them.

To be distinguished is the extent to which counsel may acquiesce in a trial court ruling and then move for a new trial on the ground that the ruling was in error. That determination is made by reference not to the appellate rules but to the rules of civil and criminal procedure and decisional law. *See, e.g.,* CR 46, CrR 8.7; *Sherman v. Mobbs*, 55 Wn.2d 202, 347 P.2d 189 (1959).

ER 103 cmt. 103, at 91 Wn.2d 1124 (1979). And in a footnote, the Supreme Court in *State v. Scott*, 110 Wn.2d 682, 687 n.4, 757 P.2d 492 (1988), stated,

Reference in this opinion to cases and commentary interpreting Fed. R. Crim. P. 52(b) is not intended to suggest that RAP 2.5(a)(3) is equivalent in all respects to the federal rule, but merely acknowledges our appellate rule's genesis in federal law. . . . Indeed, because it covers only constitutional errors, RAP 2.5(a)(3) is significantly narrower than Fed. R. Crim. P. 52(b) which covers "[p]lain errors".

(Second alteration in original.)

Plain Reading of RAP 2.5(a)(3)

¶33 Approximately 50 published appellate court opinions have been released in the last two years (and over 100 unpublished opinions) addressing, or touching upon, RAP 2.5(a)(3). These numerous opinions attempt to amend by interpretation[20] a standard clearly understood and justly applied for over 125 years. RAP 2.5(a)(3) is clear on its face and reads,

**Errors Raised for First Time on Review.** The appellate court may refuse to review any claim of error which was not raised in the trial court. However, a party may raise the following claimed errors for the first time in the appellate court: (1) lack of trial court jurisdiction, (2) failure to establish facts upon which relief can be granted, and (3) manifest error affecting a constitutional right. A party or the court may raise at any time the question of appellate court jurisdiction. A party may present a ground for affirming a trial court decision which was not presented to the trial court if the record has been sufficiently developed to fairly consider the ground. A party may raise a claim of error which was not raised by the party in

---

[20] GR 9, first adopted in 1982, explains,

The purpose of rules of court is to provide necessary governance of court procedure and practice and to promote justice by ensuring a fair and expeditious process. In promulgating rules of court, the Washington Supreme Court seeks to ensure that:

(1) The adoption and amendment of rules proceed in an orderly and uniform manner;

. . . .

(5) Minimal disruption in court practice occurs, by limiting the frequency of rule changes; and

(6) Rules of court are clear and definite in application.

Although the Supreme Court left itself the discretion to amend the court rules "without following the procedures set forth" in them (GR 9(j)(1)), the haphazard way in which our RAP 2.5(a)(3) jurisprudence has progressed should make us especially cautious. Had the *Scott* court sought to clarify or amend RAP 2.5(a)(3) as envisioned in GR 9, rather than simple recourse to ad hoc interpretation without a plain meaning analysis, perhaps the court could have provided consistent guidance of the scope of appellate review for issues raised for the first time on appeal over 20 years ago, which its chosen course has not done.

the trial court if another party on the same side of the case has raised the claim of error in the trial court.

RAP 2.5(a) at 124 Wn.2d 1111 (1994) (underline omitted).[21]

¶34 We review construction of a court rule de novo because it is a question of law. *See State v. Robinson*, 153 Wn.2d 689, 693, 107 P.3d 90 (2005). When interpreting court rules, an appellate court approaches the rules "as though they had been drafted by the Legislature." *State v. Greenwood*, 120 Wn.2d 585, 592, 845 P.2d 971 (1993). Thus, we apply rules of statutory construction to the interpretation of court rules. *City of Seattle v. Guay*, 150 Wn.2d 288, 300, 76 P.3d 231 (2003).

¶35 Were this an unfamiliar statute, the course before the appellate court would be clear. When interpreting a statute, "the court's objective is to determine the legislature's intent." *State v. Jacobs*, 154 Wn.2d 596, 600, 115 P.3d 281 (2005). If the meaning of a statute is plain on its face, an appellate court "must give effect to that plain meaning." *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9, 43 P.3d 4 (2002). To determine the plain meaning of a statute, an appellate court looks to the text, as well as "the context of the statute in which that provision is found, related provisions, and the statutory scheme as a whole." *State v. Engel*, 166 Wn.2d 572, 578, 210 P.3d 1007 (2009). An undefined term is "given its plain and ordinary meaning unless a contrary legislative intent is indicated." *Ravenscroft v. Wash. Water Power Co.*, 136 Wn.2d 911, 920-21, 969 P.2d 75 (1998). If, after this inquiry, the statute is susceptible to more than one reasonable interpretation, it is ambiguous and an appellate court "may resort to statutory construction, legislative history, and relevant case law for assistance in discerning legislative intent." *Christensen v. Ellsworth*, 162 Wn.2d 365, 373, 173 P.3d 228 (2007).

---

[21] The original 1976 version of RAP 2.5(a) did not include the last three sentences added in the 1994 version above. *See* 86 Wn.2d 1151 (1976).

¶36 Read in the context of the rest of RAP 2.5(a), RAP 2.5(a)(3) is clearly an exception allowing a party to raise an issue, for the first time on appeal, that it did not raise and preserve for review in the trial court. The language of the statute also indicates that if a party has established that a "manifest error affecting a constitutional right" occurred at trial, an appellate court should review that decision.[22] I note that either the "lack of trial court jurisdiction" or a party's "failure to establish facts upon which relief can be granted" are fatal to a cause of action. And it is clear from those cases applying the "manifest error standard" before its incorporation into the rule that the court intended the issues reviewable under authority of RAP 2.5(a)(3) to likewise be those capable of being fatal to the cause of action.[23]

¶37 As noted previously, a "manifest error" is "[a]n error that is plain and indisputable, and that amounts to a complete disregard of the controlling law or the credible evidence in the record." BLACK'S LAW DICTIONARY 622 (9th ed. 2009).[24]

---

[22] As this court recently noted in *State v. Grimes*, 165 Wn. App. 172, 187 n.17, 267 P.3d 454 (2011), the Supreme Court has stated both that appellate review in these situations is mandatory and that it is discretionary. As explained above, a plain reading of the rule indicates that review is required.

[23] The first Washington Supreme Court case squarely addressing RAP 2.5(a)(3), *Scott*, confirms this:

As our cases hold, and RAP 2.5(a)(3) succinctly states, certain instructional errors that are of constitutional magnitude may be challenged for the first time on appeal. Constitutional errors are treated specially because they often result in serious injustice to the accused. . . . Such errors also *require appellate court attention* because they may adversely affect the public's perception of the fairness and integrity of judicial proceedings.

110 Wn.2d at 686-87 (emphasis added). The *Scott* court also emphasized the more limited scope of Washington's preservation rule, noting that RAP 2.5(a)(3) "reflects a policy of encouraging the efficient use of judicial resources" by avoiding the sanctioning of "a party's failure to point out at trial an error which the trial court, if given the opportunity, might have been able to correct to avoid an appeal and a consequent new trial." 110 Wn.2d at 685.

[24] *Black's* also has a definition for "manifest constitutional error." BLACK'S LAW DICTIONARY at 622. However, the entry indicates, and research confirms, that the term was first used in 1985—almost 10 years after RAP 2.5(a)(3) was passed, and is therefore inapposite. Although the Supreme Court's recent *State v. O'Hara*, 167

¶38 Given the history of the manifest error standard and its common definition, the meaning of RAP 2.5(a)(3) is clear from a careful reading of its plain words: an appellant may raise an issue not previously raised in the trial court if it is (1) plain on the record and indisputably contrary to controlling law and (2) the error identified affects a constitutional right. Two separate burdens are placed on an appellant seeking review under the exception provided in RAP 2.5(a)(3) for review of an unpreserved error. First, a plaintiff must establish that a "manifest error" occurred and, second, a plaintiff must establish that the error affected a constitutional right. In reviewing alleged errors brought pursuant to RAP 2.5(a)(3), courts should determine whether the appellant has met the burden of showing that a manifest error occurred *before* addressing the appellant's constitutional claims. Because "[i]f it is not necessary to reach a constitutional question, it is well established policy that we should decline to do so." *State v. Speaks*, 119 Wn.2d 204, 207, 829 P.2d 1096 (1992).

¶39 If an appellant has met the burden of showing that a manifest error has occurred, then the court should determine whether the appellant has also indicated how that error implicated a constitutional right. As Judge Forrest wisely pointed out in *State v. Lynn*, 67 Wn. App. 339, 342-43, 835 P.2d 251 (1992), "Criminal law is so largely constitutionalized that most claimed errors can be phrased in constitutional terms. Suppression motions involve the Fourth Amendment. Admissions and confessions involve the Fifth and Sixth Amendments. Instructional errors may implicate constitutional due process. Hearsay involves Sixth Amendment confrontation rights." Accordingly, I agree with my colleagues in the majority that the defendant has the burden of showing how the manifest error at issue

Wn.2d 91, 100 n.1, 217 P.3d 756 (2009), opinion cites to *Black's* "manifest constitutional error" entry, the opinion fails to address how justices of the 1976 Supreme Court could rely upon a legal term invented in 1985 when they drafted RAP 2.5(a)(3). Moreover, the citation and discussion of the entry occurs in a footnote and is likely obiter dicta.

"implicates a specifically identified constitutional right." Majority at 400.

¶40 If an appellate court determines that the defendant has met both of these burdens, then the court must review the merits of the claim. And although RAP 2.5(a)(3) does not address the standard of review our courts should employ, *Chapman*, a seminal case decided almost 10 years before the promulgation of RAP 2.5(a)(3), clearly indicates that harmless error review is appropriate when an error affects an appellant's constitutional rights:

> Certainly error, constitutional error, in illegally admitting highly prejudicial evidence or comments, casts on someone other than the person prejudiced by it a burden to show that it was harmless. It is for that reason that the original common-law harmless-error rule put the burden on the beneficiary of the error either to prove that there was no injury or to suffer a reversal of his erroneously obtained judgment. . . . [B]efore a . . . constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.

386 U.S. at 24. Per *Chapman*, the State clearly has the burden of establishing that the error was harmless.

¶41 In summation, when addressing an alleged error brought pursuant to RAP 2.5(a)(3), an appellate court should analyze, consecutively, three things: (1) whether the appellant has shown that a manifest error, meaning an error that is plain and indisputable, and that amounts to a complete disregard of the controlling law occurred at trial; (2) whether the appellant has shown how that error affected a specifically identified constitutional right; and (3) whether the State has shown that the error was harmless beyond a reasonable doubt. Appellate courts should not address constitutional claims first as this is contrary to our generally accepted method of appellate jurisprudence. In addition, appellate courts should not assume arguendo that a defendant has met both burdens and proceed to harmless error analysis as this method is contrary to the plain

reading of the rule and the justness of the appellate process identified by Judge Coffin. Read in context, RAP 2.5(a)(3) clearly indicates that an appellate court must review an appellant's claims but *only if those claims are substantiated by the record presented for review and affect a specifically identified constitutional right.*

CONCLUSION

¶42 Carefully read, RAP 2.5(a)(3) provides a workable, longstanding framework for balancing the need to ensure the public's confidence in the integrity of the trial court's judgment with the duty to remain faithful to the underpinnings of the United States system of justice. By addressing only "manifest errors affecting a constitutional right" raised for the first time on review rather than all newly assigned errors, appellate courts ensure that a defendant's constitutional rights are duly protected while simultaneously heeding the "instinct of fairness due both the trial judge or agency and a litigant's adversary" discussed by Judge Coffin.

¶43 Applying Washington's longstanding manifest error exception to the issue preservation rule in the present case, at the time of Shawny Bertrand's trial, *State v. Goldberg*, 149 Wn.2d 888, 895, 72 P.3d 1083 (2003), clearly indicated that "special verdicts do not need to be unanimous in order to be final." Thus, jury instruction 13 contained a manifest error contrary to controlling law. Bertrand, then, has met the burden of showing that a manifest error occurred. However, as this court recently explained in *Grimes*, this error does not implicate a constitutional right.[25] Moreover, our Supreme Court has held in an analogous situation that issues involving the finality of nonunanimous jury decisions are not of constitutional magnitude. In *State v.*

---

[25] *Grimes*, 165 Wn. App. at 185 ("because the [*State v.*] *Bashaw*[, 169 Wn.2d 133, 234 P.3d 195 (2010),] decision is not founded in our state constitution or in the United States Constitution, an error in giving [this] special verdict [instruction] is not based on a constitutional right").

*Labanowski,* 117 Wn.2d 405, 423-24, 816 P.2d 26 (1991), the court addressed two types of jury unanimity instructions related to lesser included or lesser degrees of charged crimes. The court stated that "neither the 'acquittal first' nor the 'unable to agree' type of instruction is erroneous as a matter of law." *Labanowski,* 117 Wn.2d at 424. And the court stressed that "[n]umerous cases . . . have held that the 'acquittal first' instruction does not impinge on a defendant's constitutional rights."[26] *Labanowski,* 117 Wn.2d at 423. Thus, Bertrand has failed to meet her additional burden of showing how the error affected a specifically identified constitutional right. And, as the majority correctly determines, having failed to meet both "burdens necessary to trigger our limited discretion under RAP 2.5(a)(3) . . . we need not address the merits of her instructional challenge for the first time on appeal." Majority at 402-03.

¶44  Accordingly, I concur with the result reached by the majority in this case.

Review denied at 175 Wn.2d 1014 (2012).

---

[26] As the *Labanowski* court notes, both the Eighth and Ninth Circuit Court of Appeals have expressly found that requiring jury unanimity on a greater offense before providing jurors the option of deciding a lesser included offense is not an issue of constitutional magnitude. 117 Wn.2d at 422.