FILED
COURT OF APPEALS
DIVISION II

2014 AUG -5 AM 10: 38

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 43927-1-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| MICHAEL S. NORRIS, | |
| Appellant. | |

BJORGEN, A.C.J. — Following a stipulated facts bench trial, the trial court found Michael

Norris guilty of four counts of first degree child rape, two counts of second degree child rape,

two counts of first degree child molestation, and two counts of second degree child molestation.[1]

Norris timely appeals his judgment and sentence, asserting that (1) the trial court judge erred by

failing to recuse himself from presiding over the case, (2) the sentence for one of his second

degree child molestation convictions exceeds the statutory maximum for that offense, (3) the

sentence on his other second degree child molestation conviction, when combined with his

community custody term, exceeds the statutory maximum for that offense, and (4) the trial court

erred when it found he had the present or likely future ability to pay his legal financial

obligations.

---

[1] Norris's judgment and sentence incorrectly states that his convictions were entered pursuant to a guilty plea.

No. 43927-1-II

Norris has also filed a statement of additional grounds (SAG), in which he asserts (1) he should have been allowed to consult a federal public defender before signing his stipulation of facts agreement, (2) his defense counsel rendered ineffective assistance by allowing him to sign the stipulated facts agreement while in a fragile mental state and by engaging in unethical conduct, and (3) the trial court judge and the prosecutor committed misconduct resulting in a violation of his civil rights. Additionally, Norris repeats his appellate counsel's claim that the trial court judge should have recused himself from presiding over the case. We affirm Norris's convictions, but remand to the trial court to correct Norris's sentence consistent with this opinion.

FACTS

We recite here some of the established facts in Norris's case as stated in our opinion from his previous interlocutory appeal:

> On August 16, 2006, United States Immigration and Customs Enforcement (ICE) agents and Oregon Department of Justice agents executed a federal warrant to search Norris's Vancouver, Washington, home. Federal agents seized his computer hard drive and videotapes, constituting thousands of images of what appeared to be child pornography.
> During the search, Norris admitted to ICE Agent James Mooney that he possessed child pornography. The federal agents seized evidence from Norris's home, but did not place Norris under arrest. The Vancouver police arrested Norris based on his incriminating statements and the evidence seized by federal agents but they did not seize any evidence. The federal agents removed the seized evidence to a federal facility in Portland, Oregon, known as the Northwest Regional Computer Forensics Laboratory.
> The State charged Norris with four counts of first degree child rape, two counts of second degree child rape, one count of third degree child rape, two counts of first degree child molestation, two counts of second degree child molestation, and two counts of sexual exploitation of a minor.

*State v. Norris*, 157 Wn. App. 50, 55-56, 236 P.3d 225 (2010) (internal footnote omitted).

2

No. 43927-1-II

The State further alleged that Norris used a position or status of trust to facilitate the commission of each of his 13 charged offenses and that his offenses were part of a pattern of ongoing sexual abuse against the child victims, a female and a male. Over the course of numerous pretrial hearings spanning several months, the trial court addressed issues regarding the State's obligation to turn over certain evidence to the defense in light of an apparent conflict between state and federal law that we resolved in our opinion from Norris's interlocutory appeal. *See Norris*, 157 Wn. App. at 56-65.

At a March 9, 2007 pretrial hearing, the trial court expressed its concern about playing video recorded evidence depicting sexually abusive conduct involving minors to the jury in open court. The trial court judge stated:

> I . . . am sensitive to the fact that this is, in fact, a public setting, but I'm not going to be turning this into a circus for viewing child pornography, it's just not appropriate.
> But I, again, I'm making that as a generalized human statement, not as a decision or ruling of the Court.

Report of Proceedings (RP) (March 9, 2007) at 50. Later in the hearing, the following discussion took place:

> [Trial court]: I guess heads-up on the other thing is that if you're going to—if you are going to be asking me to limit what the jury sees, I guess at some point I'll have to—
> [State]: Preview.
> [Trial court]: —make that call.
> [State]: Make—make—yes, I agree.
> [Trial court]: (Inaudible) preview if that's what—
> [State]: Understood.
> [Trial court]: What the images are, what the attorneys have told me they are, (inaudible) I don't want to see them.

RP (March 9, 2007) at 53. At a March 30, 2007 pretrial hearing, the trial court stated its concern that viewing the video evidence in the case may violate federal child pornography laws, stating:

3

> Are immunity issues involved? I mean, I'd like—I'd be interested in what the Department of Justice is saying from the federal level, because the potential to expose—I mean, even myself sitting here looking at something that—that—that I consider to be highly distasteful to me, personally, could put me in—in a position of being in violation of the law.
>
> And I certainly don't want to do that, but at the same time, I don't want to hamper the ability of either side to present their theory of the case to a fair and impartial jury.
>
> So I would ask that you ask—make that inquiry [State], and if—[defense counsel], by all means make the same inquiry.

RP (March 30, 2007) at 75-76. The discussion then turned to issues regarding jury selection, and the trial court stated:

> I have no problem with bringing in as many people as we need to finding [sic] a fair and impartial panel, and have a special questionnaire if that's what it takes, and find out what people's sensitivities are. I mean, if someone is going to be so—I was going to say grossed out—so deeply offended by the viewing of this, then maybe we should be looking at it.
>
> I'm sorry, I just slipped into a street expression.
>
> . . . .
>
> I can tell you, as I've told you in private, that I have no desire to see it, okay.

RP (March 30, 2007) at 78-80.

Norris was given the opportunity to view the video evidence, but at the April 13, 2007 pretrial hearing the State informed the trial court that Norris had declined to do so. Defense counsel expressed concern over Norris's refusal to view the video evidence, stating:

> Mr. Norris has indicated to me on several occasions that I have not given him the opportunity to view the information, view the evidence against him. This is the evidence against him. It is explicit, it is distasteful. The jury will find it so. I think he should have the ability or the opportunity to see it before he, in essence, exercises his right to present it to a jury.

RP (April 13, 2007) at 13.

On June 14, 2007, Norris filed an affidavit of prejudice and motion to reassign the case to a different judge as a matter of right under RCW 4.12.050. Norris's affidavit alleged in part that

the trial court judge had "expressed his 'distaste' and 'disgust' with child pornography and . . . . [his wish[es] that he did not have to view the evidence in this case." Clerk's Papers (CP) at 319. In response to this allegation, the trial court judge stated that he was unsure whether he had used those particular words. The trial court further stated:

> I will tell you as a human being, I have no desire to view child pornography. I am not looking forward to being [sic] sitting here viewing it. If, in fact, it is what is truly depicted. But I don't believe I ever characterized it that way. And I'd also raise another point with you, is that I'm not the fact finder in this case. It's going to be the jury that's the fact finder. It's my job to have a fair and impartial trial and to keep the case moving in an appropriate manner under the law.
> I think, while I understand what your Counsel is saying, and I would point out to you also, the viewing of child pornography, I don't believe I would be alone in the personal human reaction to that. I think all of our judges, and probably most folks I know, would not seek out to view child pornography as a matter of choice. That's not something that they desire. Now, I'm sure there's a segment of society that's interested in that, because of the pervasiveness I read about it being on the Internet and other places like that.
> But I can honestly say I'm not looking forward to that. I don't think most people would look forward to viewing that.

RP (June 6, 2007) at 16-17. The trial court judge denied Norris's RCW 4.12.050 motion on the basis that he had already made discretionary rulings in the case, but stated that he would consider further briefing on the issue of disqualification based on actual prejudice under RCW 4.12.040.

During a September 28, 2007 motion hearing, the trial court judge ruled that the defense was entitled to examine certain evidence subject to entry of a protective order to not further disseminate the images contained in the evidence, stating:

> [T]he defense will have access through the coordination with the federal entity, whoever it is, to look at the original images. Any image that they feel they need to look at that will be presented by the State. I'm predicating that on any evidence that the State intends to present to my jury is the evidence we're talking about that they'll have access to the originals. I'm not looking to put child pornography out on the streets, I'm not looking to titillate anyone. I just don't even want to see it myself.

I didn't ask for this trial. I don't want to see these images. What little bit I've seen, to put a point on it and to put it in language I knew from the streets of New York, it grossed me out, okay? And that's why we've been going through this process of how we're going to present this to a jury. How are we going to keep the public from seeing it? How [are we] going to keep the press from seeing it?

RP (Sept. 28, 2007) at 40-42. At a November 29, 2007 motion hearing, the trial court again addressed issues regarding the presentation of video evidence at trial, stating:

I don't know if I said this on record, but I will say it now. I know I've said it in private to the two of you. I have looked at just snippets of the proposed evidence. And I'm going to have to use sort of a street term. I am concerned about the ability to get a jury that's capable of viewing what I would characterize—and again, I'm using, for lack of a better term, street language—material that is gross, okay, and in some way not inflame them at the same time.

. . . .

And I'm not saying at this point, [State], that I'm ruling that 150 photographs are too long or that an hour or 20 minutes of videotape is too long. I'm saying my knee-jerk reaction is that I'd like to be able to narrow the field.

RP (Nov. 29, 2007) at 17-18.

On January 16, 2008, Norris filed a second affidavit of prejudice and motion to reassign the case to a different judge, this time alleging actual prejudice under RCW 4.12.040. Norris's affidavit of prejudice alleged in part:

In recent weeks, I have learned that J. Wulle has been censured by the State's Commission on Judicial Conduct for actions which, in part, included gratuitous and prejudicial references regarding sexual orientation. I am charged with various sex offenses, many of which involve homosexual acts, and given the nature of J. Wulle's prejudices, I do not believe I will receive a fair and impartial trial before the assigned court.

CP at 322. Norris attached to his motion and affidavit of prejudice a copy of Judge John Wulle's censure order. The censure order stated that Judge Wulle had stipulated to violating former Code

6

of Judicial Conduct (CJC) Canons 1, 2(A), and 3(A)(3)[2] based in part on the following conduct

at a juvenile drug court conference in Los Angeles:

> b. When the facilitator assigned to the Clark County team introduced himself to the group during the first breakout session, he noted he was from San Francisco, a city he characterized as very liberal and litigious. Respondent interjected, "Yeah, and very gay." Members of the team found Respondent's comment to be inappropriate because it was gratuitous and seemed to be directed at the facilitator.
>
> . . . .
>
> d. Later in the week, during a break in the conference, other fac[ility] members asked Respondent who Clark County's facilitator was, and he answered, "the black gay guy."

CP at 326-27. The censure order found the following mitigating factors with regard to Judge

Wulle's conduct at the Los Angeles conference:

> In mitigation, Respondent's conduct appears to have been an aberration. He believes the conduct occurred as a result of his misguided attempts to fit in with the team and/or be humorous. Witnesses familiar with Respondent described his behavior at the conference as being out of character. These witnesses do not believe Respondent to be racist, homophobic or anti-Semitic. Respondent's reputation is generally that of a thoughtful jurist. There is no indication that Respondent exploited his judicial position to satisfy personal desires. Respondent maintains that he did not intend to offend or demean anyone.

CP at 329. At a January 25, 2008 hearing, the trial court denied Norris's reassignment motion,

stating:

---

[2] Former CJC Canon 1, now codified at CJC rule 1.2, provided, "Judge[s] shall uphold and promote the independence [and] integrity . . . of the judiciary." Former CJC Canon 2(A), now codified at CJC rule 2.2 provided, "Judge[s] shall respect and comply with the law and act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." Former CJC Canon3(A)(3), now codified at CJC rule 2.8(B), provided:
> Judge[s] shall be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, . . . and others with whom the judge deals in an official capacity, and shall require similar conduct of lawyers, court staff, court officials, and others subject to the judge's direction and control.

I pride myself on bending over backwards as a rule number one that anyone that walks into my courtroom regardless of who or what they are will be treated fairly and that the justice system will provide fairness to them.

That is my responsibility under the state Constitution and the federal Constitution.

I leave it for others to determine if I accomplish that task, but that is my goal, that is what I've done.

I have bent over backward[s] to make sure that you have adequate representation, that you have had more than enough resources, even when people who control the purse strings have told me, We don't want to do it, we don't think the Defense is entitled to it. I've erred on the side of protecting the rights of the defendant.

I will continue to do so.

RP (Jan. 25, 2007) at 419.

On February 4, 2008, the trial court held a hearing at which the State presented the video and photographic evidence that it intended to present at trial. During the hearing, the trial court stated, "From the beginning there has been no one who wants to look at these images any less than me. If I could get rid of this case, I would. But I have a responsibility and I'm going to fulfill it." RP (Feb. 4, 2008) at 494.

On March 4, 2008, Norris filed a motion to dismiss his charges or, in the alternative, to suppress all the photographic and video evidence based on the State's alleged discovery violations, which motion the trial court denied. Norris filed an interlocutory appeal with our court. In our opinion from Norris's interlocutory appeal, we held that the federal Adam Walsh Child Protection and Safety Act of 2006[3] did not preempt Washington State's criminal discovery rules and, thus, the State was obligated under CrR 4.7 to produce to the defense copies of the photographic and video evidence that it intended to present at trial subject to a protective order. *Norris*, 157 Wn. App. at 78. We remanded to the trial court to determine the appropriate remedy

---

[3] Pub.L. No. 109-248, § 504, 120 Stat. 629, 631 (2006) (codified at 18 U.S.C. § 3509(m)).

for the State's discovery violation, which remedy we noted could include reconsideration of Norris's dismissal and suppression motions. *Norris*, 157 Wn. App. at 79-81.

On remand, Norris entered into a stipulation in which he admitted to several of the facts forming the bases for his charges, admitted to the alleged aggravating factors, withdrew his dismissal and suppression motions, and waived his speedy trial and jury trial rights. The stipulation further provided that the State would recommend a 35-year-to-life sentence as part of a global settlement to resolve his federal and state charges. On June 1, 2012, Norris filed a motion for disqualification of the trial court judge and for substitution of counsel based on an in-chambers meeting that had occurred between the State, defense counsel, and the trial court judge prior to Norris entering into his stipulation and waivers.

The trial court denied Norris's motions at a July 30, 2012 hearing, reasoning that there was "no credible evidence of anything inappropriate that was done in my chambers." RP (July 30, 2012) at 27. With regard to the in-chambers meeting, the trial court judge recalled the following:

> In this case [the State and defense counsel] came to me and I am really shocked to find out the request to talk to me came from [defense counsel]. I have no recollection and had no role in that, I just had the attorneys appear in my chambers, and they simply told me that the case has got a federal implication, and I went okay, fine. . . . [T]he only comment I made during the whole conversation is let me know when you have the agreement.
>  . . . .
> I simply listened to attorneys who came to me with a request, they told me what they were going to do and I just went fine, let's go it or, you know, let me know when you've got it done. That I don't believe is me exercising anything more than the listening mode.

RP (July 30, 2012) at 26-27. The trial court then proceeded to the stipulated facts bench trial.

At the bench trial, the State asked the trial court whether it recalled viewing the images presented at the February 4, 2008 hearing. RP (July 30, 2012) at 40-41. The trial court responded, "I recall the hearing, Counselor, but not the images. I've made a consolidated effort to block those out of my memory. I have to admit that I had an emotional reaction to them . . . [i]n a negative way." RP (July 30, 2012) at 41. In further discussion, the trial court also stated:

> There is nothing more that I desire to do than to never see these images again. . . . I recall depictions, Counselor, but I've tried to block them out of my mind, if I can be as blunt as I can . . . I'm disgusted by looking at the images. I was deeply offended, okay. . . . And that was not a judicial response, that was a human response. . . . As a parent, I had that response, I admit it. . . . If I could avoid looking at them again, I would be a very happy man.
> But at the same time if either side is requesting that I review the images for whatever purposes you gentlemen . . . have, I will, as they say, bite the bullet and look again. . . . I have the recollection, Counsel, but I've tried very hard to blot it out of my mind. I can't be any clearer on the record than that.

RP (July 30, 2012) at 43-44. Following the stipulated facts bench trial, the trial court found Norris guilty of four counts of first degree child rape, two counts of second degree child rape, two counts of first degree child molestation, and two counts of second degree child molestation.[4] The trial court also found the aggravating circumstances alleged with regard to each of the offenses. When imposing its sentence, the trial court commented:

> I cannot believe that I am hearing what I consider to be unimaginable crimes. The cruelty you have showed these children, the depravity of the images I had to view just boggles the mind, and for that reason, I am inclined to give you a life sentence, but I'm going to honor the agreement that you made with the State, 35 years.

---

[4] The trial court granted the State's motion to dismiss its charges on two counts of sexual exploitation of a minor and one count of third degree child rape.

10

No. 43927-1-II

RP (July 30, 2012) at 103. The trial court imposed an exceptional sentence for all counts and sentenced Norris to a total 35-year term of incarceration to run concurrent with Norris's federal sentence. Norris timely appeals his convictions and sentence.

ANALYSIS

I. MOTIONS TO REASSIGN THE TRIAL COURT JUDGE

Norris first contends that the trial court judge's decision to deny his June 2007 and January 2008 motions for reassignment violated his due process rights, the appearance of fairness doctrine, and former CJC Canon 3(D)(1).[5] We disagree.

Due process, the appearance of fairness, and former CJC Canon 3(D)(1)[6] require that a judge disqualify him or herself from hearing a case if that judge is biased against a party or if his or her impartiality may be reasonably questioned. *In re Marriage of Meredith*, 148 Wn. App. 887, 903, 201 P.3d 1056 (2009). The test for determining whether a judge's impartiality might reasonably be questioned is an objective one that assumes the reasonable person knows and understands all the relevant facts. *Sherman v. State*, 128 Wn.2d 164, 206, 905 P.2d 355 (1995). We presume that a judge acts without bias or prejudice. *State v. Franulovich*, 89 Wn.2d 521, 525, 573 P.2d 1298 (1978). The party claiming bias or prejudice must support the claim with evidence of the trial court's actual or potential bias. *State v. Gamble*, 168 Wn.2d 161, 187-88, 225 P.3d 973 (2010).

We review a trial court's ruling on a reassignment motion for an abuse of discretion. *State v. Davis*, 175 Wn.2d 287, 305, 290 P.3d 43 (2012). A trial court abuses its discretion if its

_____

[5] Norris does not challenge the trial court's denial of his June 2012 motion for reassignment, and he concedes that he was not entitled to reassignment as a matter of right under RCW 4.12.050.

[6] Former CJC Canon 3(D)(1) is now codified at CJC Canon 2, Rule 2.11(A).

11

decision "is manifestly unreasonable or based upon untenable grounds or reasons." *State v. Powell*, 126 Wn.2d 244, 258, 893 P.2d 615 (1995).

Norris asserts that Judge Wulle's comments at the 2006 Los Angeles training conference, for which he was later censured, was evidence of Judge Wulle's bias against homosexual individuals. Norris further asserts that because some of his charges had alleged sexual acts against a same-sex victim, Judge Wulle's ability to impartially preside over Norris's trial might have reasonably been questioned. We disagree.

First, without excusing Judge Wulle's conduct at the conference, the censure order found such conduct to be an aberration and a misguided attempt at humor. The censure order further found that witnesses familiar with Judge Wulle did not believe him to be homophobic. More important, and even assuming that Judge Wulle's comments at the conference showed his bias against homosexual individuals, we reject any argument equating homosexuality with the alleged conduct of a defendant accused of committing pedophilic sex acts against a same-sex victim. Accordingly, we hold that the trial court did not abuse its discretion by denying Norris's January 2008 reassignment motion on this ground.

Norris also asserts that a reasonable person could question Judge Wulle's ability to be impartial based on his numerous comments about the State's proposed video and photographic evidence, which evidence showed Norris's sexual misconduct against the minor victims. Again, we disagree. Although Judge Wulle's numerous comments suggested that he had a strong personal reaction to the proposed evidence in the case, there is no evidence in the record that his personal reaction affected his ability to be impartial or affected his ability to ensure that Norris received a fair trial.

First, Judge Wulle's comments were directed solely at the proposed video and photographic evidence. The comments did not indicate that Judge Wulle had formed an opinion about Norris's guilt.

Second, several of Judge Wulle's comments were made in the context of jury selection and the logistics of presenting the evidence to the jury. For example, at the March 30, 2007 pretrial hearing, Judge Wulle stated his willingness to call a large potential jury pool and to give a juror questionnaire to determine the potential jurors' sensitivities to viewing the video and photographic evidence. Although Judge Wulle had resorted to what he described as "street language" in stating his concern over potential jurors being "grossed out" by such evidence, it is clear in context that Judge Wulle's primary concern was in securing a "fair and impartial" jury in light of the conduct shown in the video and in photographic evidence. RP (March 30, 2007) at 78-80. Judge Wulle also stated that he was personally "grossed out" by the proposed evidence at a September 28, 2007 motion hearing. RP (Sept. 28, 2007) at 40-42. But, in context, Judge Wulle's comment was directed at the logistics of presenting the evidence to the jury at trial in an open courtroom and did not express a bias against Norris. Judge Wulle also referred to the proposed evidence as "gross" a third time at the November 29, 2007 motion hearing. RP (Nov. 29, 2007) at 17-18. Specifically, Judge Wulle stated his concern "about the ability to get a jury that's capable of viewing what I would characterize--and again, I'm using, for lack of a better term, street language--material that is gross, okay, and in some way not inflame them at the same time." RP (Nov. 29, 2007) at 17-18. Again, in context, Judge Wulle made his challenged comment in regard to securing and retaining an impartial and dispassionate jury. Judge Wulle's

13

use of the terms "gross" and "grossed out" to refer to the proposed evidence in the case, while inartful, did not demonstrate his inability to be impartial while presiding over Norris's trial.

Third, with regard to Judge Wulle's comments about his personal discomfort with having to view the proposed evidence, we cannot say that such comments demonstrated his inability to be impartial. Although Judge Wulle's expressed reluctance about having to view the video and photographic evidence, he nonetheless viewed the evidence to fulfill his obligation to make discovery and evidentiary rulings in the case.

Finally, Judge Wulle's comments at the July 30, 2012 bench trial that he was "disgusted" by the video and photographic evidence did not demonstrate his inability to be impartial as he imposed the State's recommended 35-year sentence despite having discretion to impose a life sentence. RP (July 30, 2012) at 43. Accordingly, we hold that the trial court did not abuse its discretion by denying Norris's June 14, 2007 reassignment motion on this ground.

## II. SENTENCING

A.    Second Degree Child Molestation Convictions

Next, Norris contends that the trial court exceeded its statutory authority by (1) imposing an exceptional 35-year sentence term for one of his second degree child molestation convictions (count nine) and (2) by imposing a 10-year sentence term plus a 36-month community custody term for his other second degree child molestation conviction (count eight). The State concedes that the trial court erred with regard to its sentence on both counts. We accept the State's concession and remand for a correction of Norris's sentence.

RCW 9A.44.086(2) provides, "Child molestation in the second degree is a class B felony." Under RCW 9A.20.021(1)(b), "[u]nless a different maximum sentence for a classified

14

felony is specifically established by a statute of this state," the maximum sentence for a class B felony is 10 years. Although RCW 9.94A.535 allows for an exceptional sentence upward based upon various aggravating factors, a sentencing court may not impose an exceptional sentence that exceeds the statutory maximum for the offense. *State v. Gore*, 143 Wn.2d 288, 313-14, 21 P.3d 262 (2001), *overruled on other grounds by State v. Hughes*, 154 Wn.2d 118, 110 P.3d 192 (2005). Here, Norris's exceptional 35-year sentence on count nine clearly exceeded the statutory maximum sentence of 10 years and, thus, we remand to the trial court to correct Norris's sentence to conform with RCW 9A.20.021.

Additionally, RCW 9.94A.701(9) prohibits a sentencing court from imposing a term of incarceration and a term of community custody that, when combined, exceeds the statutory maximum sentence for the offense. Here, Norris's 10-year sentence term and 36-month community custody term on count eight, when combined, exceeded the 10-year statutory maximum sentence for that offense. Accordingly, we remand to the trial court to correct Norris's sentence to conform with RCW 9A.20.021 and RCW 9.94A.701(9).

B.    Legal Financial Obligations (LFOs)

Next, Norris contends that the trial court erred by finding that he had the likely present or future ability to pay his LFOs. As an initial matter, Norris does not distinguish between his statutorily mandated LFOs and the LFOs imposed within the trial court's discretion. Norris's statutorily mandated LFOs include a $500 victim assessment fee, RCW 7.68.035(1)(a), a $200 criminal filing fee, RCW 36.18.020(2)(h), and a $100 DNA (deoxyribonucleic acid) collection fee, RCW 43.43.7541. The trial court was required to impose these fees regardless of Norris's

ability to pay and, thus, it did not err by doing so. *See, e.g., State v. Lundy*, 176 Wn. App. 96, 102-03, 308 P.3d 755 (2013).

With regard to Norris's discretionary LFOs, this issue is not ripe for our consideration, and, thus, we decline to address it on the merits here. Under RCW 10.01.160, a trial court has discretion to order a defendant convicted of a felony to repay court costs, including attorney fees, as part of the defendant's judgment and sentence. However, RCW 10.01.160(3) provides:

> The court shall not order a defendant to pay costs unless the defendant is or will be able to pay them. In determining the amount and method of payment of costs, the court shall take account of the financial resources of the defendant and the nature of the burden that payment of costs will impose.

A trial court is not required to enter formal, specific findings about a defendant's ability to pay discretionary LFOs before imposing the LFOs. *State v. Curry*, 118 Wn.2d 911, 916, 829 P.2d 166 (1992). However, the record must be sufficient for us to review whether "'the trial court judge took into account the financial resources of the defendant and the nature of the burden'" under a clearly erroneous standard. *State v. Bertrand*, 165 Wn. App. 393, 404, 267 P.3d 511 (2011) (quoting *State v. Baldwin*, 63 Wn. App. 303, 312, 818 P.2d 1116, 837 P.2d 646 (1991)), *review denied*, 175 Wn.2d 1014 (2012).

However, in *Bertrand*, we held that "'the meaningful time to examine the defendant's ability to pay is *when the government seeks to collect the obligation.*'" 165 Wn. App. at 405 (quoting *Baldwin*, 63 Wn. App. at 310) (emphasis added). We also noted:

> "The defendant may petition the court at any time for remission or modification of the payments on [the basis of manifest hardship]. Through this procedure the defendant is entitled to *judicial scrutiny* of his obligation and *his present ability to pay at the relevant time.*"

*Bertrand*, 165 Wn. App. at 405 (alteration in original) (quoting *Baldwin*, 63 Wn. App. at 310-11); *see also Lundy*, 176 Wn. App. at 108 (discussing ripeness of LFO challenge). Here, there is no evidence in the record that the State has yet attempted to collect Norris's LFOs. Accordingly, this issue is not ripe for our review, and we decline to address it further here.

### III. SAG ISSUES

In his SAG, Norris first argues that he should have been allowed to consult a federal public defender before signing his stipulation of facts agreement with the State. But Norris does not assert, nor does the record show, that anyone prevented him from consulting with his federal public defender prior to signing his stipulation of facts agreement. Because Norris's argument on this issue concerns matters outside of the record on review, we do not address it further here. *See State v. McFarland*, 127 Wn.2d 322, 338 n.5, 899 P.2d 1251 (1995) ("[A] personal restraint petition is the appropriate means of having the reviewing court consider matters outside the record.").

Next, Norris argues in his SAG that his defense counsel rendered ineffective assistance by allowing Norris to sign his stipulated facts agreement while in a fragile mental state. Again, Norris's claim refers to matters outside the appeal record and, therefore, we do not address it in this opinion. *McFarland*, 127 Wn.2d at 338 n.5. Norris also asserts that his defense counsel was ineffective for engaging in unethical conduct. Specifically, Norris asserts that his counsel engaged in unethical conduct by engaging in improper communications with the prosecuting attorney's office and with the trial court judge without his presence. The record on appeal contains an affidavit by defense counsel that acknowledges that defense counsel engaged in this conduct. However, Norris does not allege, and counsel's affidavit does not show, any prejudice

17

resulting from defense counsel's conduct. Accordingly, Norris fails to demonstrate ineffective assistance of counsel on this ground. *See McFarland*, 127 Wn.2d at 334-35 (To demonstrate ineffective assistance of counsel, a defendant must show *both* deficient representation *and* resulting prejudice.).

Next, Norris argues that the prosecutor and the trial court engaged in misconduct resulting in a violation of his civil rights. The nature of Norris's arguments on this issue is difficult to discern. Norris first appears to argue that the trial court's grant of continuances violated his right to a speedy trial. Norris does not indicate, however, whether he is raising this claim with regard to his constitutional speedy trial right or, instead, is challenging his right to a timely trial under court rule CrR 3.3. Additionally, Norris does not indicate which specific continuance ruling or rulings he is challenging, and he provides no argument as to how the trial court abused its discretion in granting those continuances. Although a SAG need not make reference to the record or cite to legal authority, "the appellate court will not consider a defendant/appellant's statement of additional grounds for review if it does not inform the court of the nature and occurrence of alleged errors" and "the appellate court is not obligated to search the record in support of claims made in" the SAG. RAP 10.10(c).

Norris also appears to assert that the prosecutor committed misconduct by presenting the trial court with transcripts from recordings of telephone calls Norris made while in jail, which transcripts Norris argues lack any probative value. Again, Norris's argument on this issue is difficult to discern. The transcripts at issue were not used as substantive evidence of Norris's guilt and, instead, were simply an attachment to the State's response to Norris's defense counsel's motion to withdraw from representation. Even if the State had sought admission of the

transcripts as substantive evidence of Norris's guilt, the transcripts contain several admissions by Norris to committing some of the charged crimes and were thus relevant under ER 401. Accordingly, this claim is meritless.

Finally, Norris asserts in his SAG that the trial court erred by denying Norris's reassignment motions. Because we have already addressed this claim above as argued by Norris's appellate counsel, we do not revisit the issue again here. Accordingly, we affirm Norris's convictions, but remand to the trial court for a correction of Norris's sentence consistent with this opinion.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

BJORGEN, J.

We concur:

JOHANSON, C.J.

LEE, J.