# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 71323-0-I |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| JOSHUA DALE MASON-WEBB, | ) | |
| Appellant. | ) | FILED: April 20, 2015 |
| | ) | |

APPELWICK, J. — Mason-Webb appeals the trial court's conclusion that he had the present or future ability to pay the discretionary legal financial obligation that it imposed. Mason-Webb was convicted of first degree escape when he failed to return to his work release program after being authorized to leave to apply for a job. In a statement of additional grounds, he argues that the trial court erred in concluding that the definition of escape in RCW 9A.76.110 is unambiguous. He also contends that he received ineffective assistance of counsel. We remand for resentencing and otherwise affirm.

## FACTS

On July 30, 2012, Joshua Mason-Webb was found guilty of conspiracy to deliver meth. His sentence included 10 months in the King County Work/Education Release (WER) program. That same day, Mason-Webb reviewed and signed the WER conditions of conduct, which documented the rules of the WER program.[1]

---

[1] This form included several conditions of participating in the program. Notably, Mason-Webb agreed that he would not commit a crime and that he must be on time when reporting back to the work release facility. The form stated that three written warnings in a 30 day period for being less than 60 minutes late would result in removal from WER and incarceration into secure detention. It further stated that one incident of being 60 minutes late or more would result in removal from WER and incarceration into secure detention.

The King County WER program is located on the tenth floor of the King County courthouse. The WER program houses court-ordered participants who have jobs, are searching for jobs, or are going to school. Participants are allowed to leave the facility, but need passes to do so.

When a participant is first ordered to participate in the program, he or she meets with a caseworker who explains the rules of the program, how passes work, and what to expect. The caseworker reviews the WER program packet with the participant. The packet includes an escape form, which details the different degrees of escape a participant can be charged with if he or she leaves without a pass or fails to return.[2] A pass is issued after a participant makes a written request to leave to perform an acceptable function such as job searching. The pass has a specific time to leave and a specific time to return written on it.

On August 8, 2012, Mason-Webb was transferred from the King County Jail to the WER program. Mason-Webb met with caseworker John Markholt for an orientation to the WER program. Markholt reviewed the escape form with Mason-Webb. Markholt explained the form to Mason-Webb and said that it is the most important form in the WER packet. Markholt explained that once Mason-Webb was transferred into the WER program, he had to have an authorized pass to leave the facility and needed to return within the time specified on the pass. And, he told Mason-Webb that if he left the facility

---

[2] The escape form outlines the three different degrees of escape (escape in the first degree, escape in the second degree, and escape in the third degree). It specifically lists the relevant statutes—RCW 9A.76.110, RCW 9A.76.120, and RCW 9A.76.130. By signing it, the WER program participant acknowledges that violating the program policies will result in disciplinary action and potential escape charges.

without an authorized pass, he would face a potential escape charge. Mason-Webb did not have any questions about the form and he signed it.

During the next three months, Mason-Webb participated in the WER program and was permitted out of the facility on dozens of occasions on temporary passes. On November 8, 2012, Mason-Webb requested a temporary pass to apply for a job in Kent. The pass was authorized from 8 a.m. to 11 a.m.

Mason-Webb checked out of the WER facility and left at 8:03 a.m. on November 8. At 10:00 a.m. that morning, Markholt received a voice mail message from Mason-Webb stating that he would be a little late returning to the facility. Mason-Webb did not return to the facility on November 8 or any of the days following.

On November 15, 2012, Mason-Webb was arrested. The State subsequently charged him with escape in the first degree pursuant to RCW 9A.76.110. Mason-Webb moved for dismissal via a Knapstad[3] motion. The motion was denied and the case eventually proceeded to trial.

Following a jury trial, Mason-Webb was convicted of escape in the first degree. On December 3, 2013, the court sentenced Mason-Webb to 33 months of incarceration. In addition to imposing $600 of mandatory legal financial obligations (LFOs), the sentencing court ordered him to pay discretionary court costs in the amount of $465. The felony judgment and sentence stated:

> OTHER FINANCIAL OBLIGATIONS: Having considered the defendant's present and likely future financial resources, the Court concludes that the defendant has the present or likely future ability to pay the financial obligations imposed.

---

[3] State v. Knapstad, 107 Wn.2d 346, 353-54, 729 P.2d 48 (1986).

Mason-Webb appeals.

## DISCUSSION

Mason-Webb argues the trial court erred when it found that he had the ability to pay discretionary court costs. He contends this is so because it had insufficient evidence that Mason-Webb possessed the ability to pay as required by RCW 10.01.160(3). He also makes a statement of additional grounds and contends that the trial court erred in concluding that the definition of escape in RCW 9A.76.110 is unambiguous. He further contends that he received ineffective assistance of counsel.

### I. Discretionary Legal Financial Obligations

Mason-Webb argues that the trial court failed to consider his ability to pay discretionary court costs and thus had insufficient evidence to impose them.

As a threshold matter, the State contends that because Mason-Webb did not object to the imposition of the costs and the trial court's finding below that he failed to preserve the issue for appeal. RAP 2.5(a) states that an appellate court may refuse to review any claim of error which was not raised in the trial court. But, RAP 2.5(a) grants appellate courts discretion to accept review of claimed errors not appealed as a matter of right. State v. Russell, 171 Wn.2d 118, 122, 249 P.3d 844 (2011). The Washington Supreme Court recently considered the issue of whether a defendant may raise the imposition of discretionary LFOs for the first time on appeal under RAP 2.5(a) in State v. Blazina, ___Wn.2d ___, 344 P.3d 680, *1 (2015).

In Blazina, a consolidated case, the defendants appealed the imposition of discretionary LFOs and argued that the trial court erred when it found them able to pay. Id. at *1-*2. But, the Court of Appeals declined to consider the defendants' claims

4

pursuant to RAP 2.5(a), because the defendants did not object at the sentencing hearings to the findings of ability to pay the obligations. Id. The Washington Supreme Court disagreed. See id. at *3. The Blazina court stated that while unpreserved LFO errors do not command review as a matter of right and while the Court of Appeals properly declined discretionary review, it would invoke its discretion under RAP 2.5(a). Id. at *3. The court opined that each appellate court must make its own decision to accept discretionary review. Id. It stated that national and local cries for reform of broken LFO systems demand that it exercise its RAP 2.5(a) discretion. Id. We agree and reach the merits of Mason-Webb's claim.

Mason-Webb argues that in order to impose discretionary LFOs under RCW 10.01.160(3), the sentencing judge must consider the defendant's present or likely future ability to pay. RCW 10.01.160(3) states,

> The court shall not order a defendant to pay costs unless the defendant is or will be able to pay them. In determining the amount and method of payment of costs, the court shall take account of the financial resources of the defendant and the nature of the burden that payment of costs will impose.

Neither RCW 10.01.160 nor the constitution requires a trial court to enter formal, specific findings regarding a defendant's ability to pay discretionary court costs. State v. Lundy, 176 Wn. App. 96, 105, 308 P.3d 755 (2013). But, if an unnecessary finding of fact is made, perhaps through inclusion of boilerplate language in the judgment and sentence, we review it under the clearly erroneous standard. Id. A finding of fact is clearly erroneous when, although there is some evidence to support it, review of all of the evidence leads to a definite and firm conviction that a mistake has been committed. Id.

5

As such, the State's burden for establishing whether a defendant has the present or likely future ability to pay discretionary LFOs is a low one. Id. at 106.

Here, the language in the judgment and sentence was "the Court concludes that the defendant has the present or likely future ability to pay the financial obligations imposed." (Emphasis added.) Mason-Webb characterizes the language in the judgment and sentence as a finding of fact. The State accepts this characterization. Such a characterization would align the case with Lundy. See 176 Wn. App. at 105 n.7. Mason-Webb then contends that there is nothing in the record to support the trial court's finding of fact. But, unlike the "court finds" language used in Lundy, the trial court here stated that the "court concludes." Id. Unlike in Lundy, the trial court's language does not suggest it made an unnecessary finding. The trial court stated a necessary conclusion, and we decline to rewrite it as a finding of fact. Mason-Webb has appealed only the "finding of fact," therefore his challenge fails.

Even assuming we treat the trial court's statement as a finding of fact, Mason-Webb fails to illustrate that the finding was clearly erroneous. Mason-Webb relies on State v. Bertrand, 165 Wn. App. 393, 267 P.3d 511 (2011) for his assertion. In Bertrand, the defendant had disabilities that may have reduced or possibly eliminated her future ability to pay LFOs, but the trial court ordered the defendant to pay the LFOs. Id. at 404 & n.15. The Bertrand court concluded that there was no evidence to support the trial court's finding that Bertrand had the present or future ability to pay the LFOs. Id. at 404.

By contrast, here, the evidence does not support a definite conviction that a mistake has been committed. First, at the time of the offense, Mason-Webb was participating in work release and had been granted a pass to apply for a job. He was able

to work unlike the defendant in <u>Bertrand</u>. Moreover, at sentencing, Mason-Webb's attorney opined that Mason-Webb was very hard working, did a lot of legal research on the case, and that in his opinion, Mason-Webb has a great chance of success in the community if he applies himself. Based on this record, the trial court's "finding of fact" was not clearly erroneous. Therefore, remand on this basis is improper.

Mason-Webb assigned error to only the trial court's finding of fact related to his ability to pay, not to the trial court's ultimate decision to impose those costs. He did so ostensibly because of the state of the law at the time he filed his appeal.[4] Even though Mason-Webb did not explicitly assign error to the trial court's imposition of the LFO, we will also consider that challenge now in light of <u>Blazina</u>.[5] <u>See</u> RAP 7.3 (stating that the appellate court has the authority to perform all acts necessary or appropriate to secure the fair and orderly review of a case); <u>State v. McCormick</u>, 152 Wn. App. 536, 539-40, 216 P.3d 475 (2009) (concluding that a new rule applies retroactively even if defendant failed to object or make argument previously, because justice demands that similarly situated defendants whose appeals are pending direct review deserve like treatment following a change in the law).

The <u>Blazina</u> court ultimately concluded that RCW 10.01.160(3) requires the record to reflect that the sentencing judge made an individualized inquiry into the defendant's

---

[4] At the time of the briefing, a challenge to the imposition of LFOs was not ripe for review until the State sought to collect. <u>Lundy</u>, 176 Wn. App. at 108. The Washington Supreme Court's recent decision in <u>Blazina</u> changed that limiting standard to allow challenges to the trial court's imposition of an LFO prior to collection. <u>See</u> 344 P.3d at *2 n.1.

[5] It is clear from Mason-Webb's briefing that he seeks to prove that a proper review of his financial situation would have illustrated that he did not have the present or future ability to pay the discretionary LFO. In other words, his ultimate argument is that the sentencing court erred when it imposed the discretionary LFO.

current and future ability to pay before the court imposes LFOs. Id. at *6. This inquiry also requires the court to consider important factors, such as incarceration and a defendant's other debts, including restitution, when determining a defendant's ability to pay. Id. The Blazina court concluded that, because the records before it did not show that the sentencing judges inquired into either defendant's ability to pay, remand to the trial court for new sentence hearings was appropriate. Id.

Here, although there is evidence present in the record that Mason-Webb might have the ability to pay the discretionary LFO in the future, there is no evidence in the record that the sentencing court made the individualized and detailed inquiry as is now necessary under Blazina. As a result, we remand to the trial court for a new sentencing hearing.

## II.  *Knapstad* Motion and Statutory Interpretation

Mason-Webb challenges the trial court's interpretation of the escape statute, because he contends the meaning of the word "escape" is ambiguous.[6] This court reviews issues of statutory interpretation de novo. Cerrillo v. Esparza, 158 Wn.2d 194, 199, 142 P.3d 155 (2006).

Our primary duty in interpreting any statute is to discern and implement the intent of the legislature. State v. J.P., 149 Wn.2d 444, 450, 69 P.3d 318 (2003). Our starting point must always be the statute's plain language and ordinary meaning. Id. When the

---

[6] Mason-Webb labels his assignment of error as a challenge to the denial of his Knapstad motion. A defendant who goes to trial cannot appeal the denial of a Knapstad motion. State v. Richards, 109 Wn. App. 648, 653, 36 P.3d 1119 (2001). However, the content of Mason-Webb's argument pertains to statutory interpretation. To the extent that Mason-Webb challenges the trial court's interpretation of the escape statute, we may review that challenge on appeal. See State v. Peters, 35 Wn. App. 427, 430-31, 667 P.2d 136 (1983) (engaging in statutory interpretation on appeal).

plain meaning is unambiguous—that is, when the statutory language admits of only one meaning—the legislative intent is apparent and we will not construe the statute otherwise. Id. The plain meaning of the statute may be discerned from all the legislature has said in the statute and related statutes which disclosed legislative intent about the provision in question. Id. Legislative definitions provided by the statute are controlling, but in the absence of a statutory definition, we will give a term its plain and ordinary meaning ascertained from a standard dictionary. State v. Sullivan, 143 Wn.2d 162, 175, 19 P.3d 1012 (2001).

Mason-Webb first argues that because the term "escape" is subject to differing interpretations, the escape statute is ambiguous, and thus, the trial court erred when it did not apply the rule of lenity. Under the rule of lenity, the court must adopt the interpretation most favorable to the criminal defendant. State v. McGee, 122 Wn.2d 783, 787, 864 P.2d 912 (1993). According to Mason-Webb, the word "escape" in the escape statute does not include a failure to return.

But, a plain reading of the statute and the legislative intent indicates that Mason-Webb's argument is without merit. Mason-Webb was convicted of escape in the first degree, RCW 9A.76.110. A person is guilty of first degree escape if, "he or she knowingly escapes from custody or a detention facility while being detained pursuant to a conviction of a felony or an equivalent juvenile offense." RCW 9A.76.110(1). RCW 9A.76.110(2) states that it is an affirmative defense to escape in the first degree that uncontrollable circumstances prevented the person from "remaining in custody or in the detention facility or <u>from returning to custody or to the detention facility.</u>" (Emphasis added.) The plain language of the statute is clear that "escape" also evinces a failure to return.

9

Mason-Webb also contends that because common usage of the word "escape" implies leaving physical confinement without permission, he could not have escaped when he was out on his authorized pass. The escape statutes require an individual to escape from either a detention facility or from custody. See RCW 9A.76.110, RCW 9A.76.120, RCW 9A.76.130. He contends that one cannot escape from a detention facility unless he or she is physically confined. By making this argument he is really claiming ambiguity in the meaning of "custody" and "detention facility" as written in the statutes—not "escape." But, "detention facility" is explicitly defined in RCW 9A.76.010(3). The definition of "detention facility" explicitly includes a person in work release, furlough, or other such facility or program. RCW 9A.76.010(3)(e). And, "custody" is explicitly defined in RCW 9A.76.010(2) and includes restraint pursuant to an order of a court.[7]

Moreover, this court has already rejected this argument. In State v. Peters, 35 Wn. App. 427, 428, 667 P.2d 136 (1983), a consolidated case, one of the defendants, Norlund, was being detained in a juvenile detention facility. Norlund was released pursuant to a pass which directed her to return to the facility at 11 a.m. six days later. Id. at 428-29. Norlund did not return and was convicted of second degree escape. Id. at 429. The other defendant, Peters, was being detained at a juvenile detention facility. Id. She left the facility in the custody of a counselor and participated in an off campus celebration at a pizza parlor marking the conclusion of a drug-alcohol education program. Id. As the

---

[7] Mason-Webb argues that notwithstanding these statutory definitions, the meaning of "escape" is still unclear and ambiguous because "detention facility" and "custody" only explain what a person escapes from, not the act of escaping. But, Mason-Webb's argument is that he could not have escaped when he was not in physical confinement. Thus, he himself connects the definition of "detention facility" to the meaning of "escape."

group left the pizza parlor, Peters ran away. Id. Peters was convicted of second degree escape. Id.

On appeal, Norlund and Peters argued that because the escape statute defines "'detention facility'" as "'any place used for the confinement of a person,'" one cannot be guilty of escape "'from a detention facility,'" unless he or she escapes from a place of confinement. Id. at 430 (quoting former RCW 9A.76.010(2) (1979)). This is the same argument Mason-Webb makes here.

In rejecting this argument, the Peters court reasoned that a detention facility is "'any place used for the confinement of a person . . . in any work release, furlough, or other such facility or program.'" Id. at 430-31 (quoting former RCW 9A.76.010(2)(e) (1979)); RCW 9A.76.010(3)(e). It continued that the term "place" thus encompasses any area in which a person is permitted to go or remain according to the terms of his work release, furlough, or comparable program. Id. at 431. It concluded that a person who, while on work release or furlough, is not within the area where he is authorized to be at a particular time, or a person who has remained in an area he was authorized to go beyond the time permitted him, has escaped from a detention facility. Id. Based on Peters, even if we apply the common meaning of escape that Mason-Webb urges—leaving physical confinement in a specific place—Mason-Webb's actions still constitute escaping from a detention facility as required by RCW 9A.76.110.

Mason-Webb contends that because the definition of detention facility is defined by statute and is not ambiguous, the "judicially construed" definition from Peters was improperly applied here. As a preliminary matter, the court in Peters was not introducing an alternate definition of "detention facility." Instead, it was applying the statutory

11

definition and interpreting how that definition applied in a specific context. Further, even if the Peters court improperly construed the definition of "detention facility," the legislature is presumed to be aware of judicial constructions of existing statutes. Hazel v. Van Beek, 135 Wn.2d 45, 58, 954 P.2d 1301 (1998). Since Peters was decided in 1983, the legislature—which has amended RCW 9A.76.010 numerous times since—has not altered the language of the relevant statutes so as to expressly overrule the holding in Peters. See id.; LAWS OF 2013, ch. 43, § 1; LAWS OF 2009, ch. 549, § 1003; LAWS OF 2001, ch. 264, § 4; LAWS OF 1991, ch. 181, § 6.

Mason-Webb then attempts to distinguish his case from Peters by claiming that he was not in any work release, furlough, or comparable program at the time of the escape, but was on an authorized pass. But, as was decided in Peters, a person who, while on work release, is not within the area where he is authorized to be at a particular time, has escaped from a detention facility. Peters, 35 Wn. App. at 431. Mason-Webb's pass required that he return to the work release facility. He failed to do so.

The trial court did not err in its interpretation of the escape statute.

III.  Ineffective Assistance of Counsel

In his statement of additional grounds, Mason-Webb also argues that he received ineffective assistance of counsel. To prevail on a claim of ineffective assistance, a defendant must show that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the trial. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). There is a strong presumption of effective assistance. In re Det. of Moore, 167 Wn. 2d 113, 122, 216 P.3d 1015 (2009).

First, Mason-Webb asserts that his attorney should have requested a lesser degree jury instruction. His attorney requested only a lesser included offense jury instruction.

A defendant is entitled to an instruction on an inferior degree offense when

"(1) the statutes for both the charged offense and the proposed inferior degree offense "proscribe but one offense"; (2) the information charges an offense that is divided into degrees, and the proposed offense is an inferior degree of the charged offense; and (3) <u>there is evidence that the defendant committed only the inferior offense</u>."

State v. Peterson, 133 Wn.2d 885, 891, 948 P.2d 381 (1997) (emphasis added) (quoting Sate v. Foster, 91 Wn.2d 46, 472, 589 P.2d 789 (1979) and State v. Daniels, 56 Wn. App. 646, 651, 784 P.2d 579 (1990)); State v. Tamalini, 134 Wn.2d 725, 732, 953 P.2d 450 (1998).

There is no evidence that Mason-Webb committed only the inferior offense of second degree or third degree escape. Therefore, Mason-Webb would not have been entitled to an inferior degree instruction and counsel's performance was not deficient.

The two elements that distinguish first degree escape from the lesser degrees of the crime are that the defendant knowingly escaped while being detained pursuant to a conviction of a felony. Compare RCW 9A.76.110 with RCW 9A.76.120, and RCW 9A.76.130. In order to possess the requisite knowledge to be convicted of escape in the first degree, Mason-Webb needed to know only that he was leaving confinement without permission. RCW 9A.08.010(b); 11A WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 120.26, at 500 (3d ed. 2008) (WPIC). He did not need to know that what he was doing was defined by law as being unlawful or that it was an element of a crime. RCW 9A.08.010(b); WPIC 120.26. There was uncontested evidence in the

13

record that Mason-Webb knew he was not allowed to leave work release or return late after leaving on an authorized pass. It is not disputed that he was being detained because of a felony conviction. Because of this, there is no evidence that Mason-Webb committed only an inferior offense. As a result, counsel's failure to request a lesser degree instruction was not deficient nor did it prejudice Mason-Webb's trial.

Secondly, Mason-Webb claims that his attorney should have objected to the prosecutor's improper conduct during trial. Specifically, he contends that the prosecutor acted improperly when she presented the definition of a "judicial construction of detention facility" from Peters on a PowerPoint slide during closing argument. He claims that because the definition was improper, counsel should have objected. But, Mason-Webb does not specifically recount what was on the PowerPoint slide nor is the actual slide in the record for our review. As such, we cannot review this argument. See RAP 10.10(c) ("[T]he appellate court will not consider a defendant's statement of additional grounds for review if it does not inform the court of the nature and occurrence of alleged errors."); State v. O'Connor, 155 Wn. App. 282, 293, 229 P.3d 880 (2010) (declining to review statement of additional grounds where appellant did not explain the underlying facts for his claims).

Mason-Webb also claims that his attorney should have objected to the prosecutor's rhetorical question. During closing argument, the prosecutor asked the jury "[H]ow else would we keep people in work release programs if not for the rules that require them to return?" He claims that it is improper for the prosecutor to argue that the jury should convict to protect the community or deter future law breaking. He further contends

that this argument improperly appealed to the passion and prejudice of the jury by implying that the jury must convict to deter future escape.

A prosecuting attorney's allegedly improper remarks must be reviewed in the context of the total argument.  State v. Brown, 132 Wn.2d 529, 561, 940 P.2d 546 (1997). Mason-Webb mischaracterizes the prosecutor's statement in the context of her closing argument.  In closing, the prosecutor was highlighting that a person can be guilty of escape even if his behavior was not dramatic, like digging a tunnel under a prison wall. She was emphasizing that, because work release is not as structured as prison that the work release program would be ineffective if participants were not bound by the law to return to the program after leaving temporarily.  She was attempting to provide support for the elements of the crime.  She was not encouraging the jury to convict in order to protect the community or deter future law breaking.  As the prosecutor's comments were not improper, there were no improper comments to which Mason-Webb's attorney needed to object.  As such, Mason-Webb did not receive ineffective assistance of counsel.

We remand for resentencing.  We otherwise affirm.

WE CONCUR: