IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 30801-4-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| SIFA TIMAS TUTU, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, J. — Sifa Tutu appeals his conviction for first degree rape of

a child. He argues that the trial court violated his right to a unanimous jury verdict

because it failed to give a *Petrich*[1] instruction. Mr. Tutu also argues that the trial court

erred in imposing $6,805.66 in discretionary legal financial obligations (LFOs) without

making an individualized inquiry into his ability to pay. We reject his first argument and

accept his second argument. We, therefore, affirm Mr. Tutu's conviction but remand to

the trial court for it to make an individualized inquiry into Mr. Tutu's ability to pay

discretionary LFOs.

---

[1] *State v. Petrich*, 101 Wn.2d 566, 683 P.2d 173 (1984), *overruled in part on other grounds by State v. Kitchen*, 110 Wn.2d 403, 756 P.2d 105 (1988).

FACTS

In 2010, Rachell Spears lived in a house with her four children and her then-boyfriend, Daniel.[2] Daniel became friends with 18-year-old Mr. Tutu, as they were both Sudanese and both spoke Nubian. Mr. Tutu moved in with the family, and stayed in the guest bedroom for several months. Mr. Tutu was close with two of the children, seven-year-old E.B. and six-year-old S.B., and would take the girls to the park, to African parties, and would watch them in the house while other people would drink and smoke. Mr. Tutu had a drug and alcohol problem and, at some point, Ms. Spears kicked him out.

Ms. Spears shared custody of the children with their father, Ernest, who lived in a different house than Ms. Spears. The children were at their mother's house from August 21, 2010 to August 24, 2010. During their stay, E.B., S.B., and their two-year-old brother K.B. all slept in the guest bedroom. S.B. and K.B. shared a mattress on the floor, while E.B. slept on a bed in the room.

The night of August 24, Ms. Spears put sticks in the guest bedroom window to prevent Mr. Tutu from entering her house. Nevertheless, at some point in the early evening, Mr. Tutu entered through the window, turned the light off, and situated himself on the floor in between the bed and the mattress. At 8:00 p.m., E.B. and S.B. both went

---

[2] Daniel and Ms. Spears were married at the time of trial.

2

to bed. S.B. joined K.B. on the mattress, and E.B. went to sleep on the bed. Neither Ms. Spears nor Daniel put the girls to bed, and the lights were already off when the girls went into the bedroom. At around 3:00 a.m., Mr. Tutu took S.B.'s blanket. While S.B. was asleep, Mr. Tutu reached under S.B.'s nightgown and penetrated her vagina with the middle finger of his left hand. S.B. woke up to Mr. Tutu touching her. Mr. Tutu rolled S.B. from the mattress and on top of him. Mr. Tutu then penetrated S.B.'s anus with his penis. From her bed, E.B. saw Mr. Tutu touch S.B. with his hand. S.B. went back to sleep. When S.B. woke up in the morning, Mr. Tutu was asleep on the floor.

The morning of August 25, Ms. Spears woke up and found Mr. Tutu sitting on her couch in her front room. Ms. Spears told Mr. Tutu to leave. She checked the guest bedroom window, and the sticks she had used to barricade the window were gone. Later in the day, Ms. Spears' sister, Andrea Connet, came to the house and drove E.B. and S.B. to the fair. Ms. Connet noticed E.B. smelled like smoke and was concerned about the children's home environment, so she asked E.B. if she had a place to sleep at night. In answering Ms. Connet's question, E.B. disclosed that Mr. Tutu slept with S.B. on S.B.'s mattress. Ms. Connet then questioned S.B. S.B. pointed to her pubic area and said that Mr. Tutu touched her there.

Ms. Connet told her husband about S.B.'s disclosure, and Ms. Connet's husband told S.B.'s father, Ernest. Ernest went to the police station and filed a report the next day. When Ernest asked S.B. what happened, S.B. told him that Mr. Tutu put his finger in her vagina but did not describe any other contact. Ernest took S.B. to Kids Haven the next week, where a child interviewer, Mari Murstig, interviewed her. S.B. described how Mr. Tutu touched her underneath her underwear, and also marked her buttocks and Mr. Tutu's penis on body maps.

Detective Mary Buchan watched S.B.'s interview at Kids Haven and determined she needed to interview Mr. Tutu. In the interview, Mr. Tutu said he was drunk and high that night. He admitted to Detective Buchan that he had a sexual encounter with S.B. and that he put the middle finger of his left hand in her vagina. Mr. Tutu acknowledged that he rolled S.B. from the mattress and on top of him, but denied that anything else happened. Based on this information, the State charged Mr. Tutu with first degree rape of a child under RCW 9A.44.073.

At trial, S.B. testified that Mr. Tutu penetrated her vagina with his finger and penetrated her anus with his penis. Ms. Murstig corroborated S.B.'s testimony with the body map diagrams from Kids Haven. E.B. testified she saw Mr. Tutu touch S.B. "[o]n her privates," but did not describe any other conduct. Report of Proceedings (RP) at 268.

4

Mr. Tutu also testified at trial. He testified he is from Khartoum, Sudan, and that a military commander took him and his two brothers away from their parents when Mr. Tutu was four years old, and the commander forced them to fight in the Sudanese civil war. Both of Mr. Tutu's brothers died in the war. When Mr. Tutu was 10 years old, he escaped back to his parents' home in Khartoum. Mr. Tutu then fled to Egypt, lived there for several years, and eventually came to the Tri-Cities when he was 12 years old. Mr. Tutu testified he did not remember the weekend in August 2010 that precipitated this case, denied being in Ms. Spears' house that night, and also could not really remember talking to Detective Buchan.

During closing arguments, the prosecutor argued to the jury that it could convict Mr. Tutu based on when he penetrated S.B.'s vagina with his finger or when he penetrated S.B.'s anus with his penis. The State did not elect the specific act on which the jury should rely in its deliberation nor did the trial court give a *Petrich* instruction.

The jury convicted Mr. Tutu. The trial court sentenced him to 103 months to life. The trial court also imposed a $500.00 fine and $7,605.66 in costs, for a total of $8,105.66 in LFOs. Of that sum, $6,805.66 were discretionary costs, including a $4,248.54 special costs reimbursement, a $2,100.00 court-appointed attorney fee, a $250.00 jury demand fee, a $147.12 witness fee, and a $60.00 sheriff's service fee. The

No. 30801-4-III
*State v. Tutu*

judgment and sentence contained the following boilerplate language: "the defendant has the ability or likely future ability to pay the legal financial obligations imposed herein." Clerk's Papers (CP) at 40. The trial court did not mark the box next to this boilerplate language. The trial court also did not inquire into Mr. Tutu's ability to pay the LFOs. Mr. Tutu did not object to the LFOs at the sentencing hearing. This appeal followed. On December 3, 2013, this court stayed this appeal pending the Washington Supreme Court's decision in *Blazina*.[3] On April 16, 2015, this court lifted the stay.

## ANALYSIS

1. *Whether the lack of a unanimity instruction deprived Mr. Tutu of his right to a unanimous jury verdict*

The Washington Constitution gives criminal defendants the right to a unanimous jury verdict. CONST. art. I, § 21. In cases where the State presents evidence of multiple criminal acts and any one of these acts could constitute the crime charged, the jury must unanimously agree on the same act that constitutes the crime in order to convict the defendant. *Petrich*, 101 Wn.2d at 572. To ensure jury unanimity in "multiple acts" cases, "either the State [must] elect the particular criminal act upon which it will rely for conviction, or . . . the trial court [must] instruct the jury that all of them must agree that the same underlying criminal act has been proved beyond a reasonable doubt." *State v.*

---

[3] *State v. Blazina*, 182 Wn.2d 827, 344 P.3d 680 (2015).

6

*Kitchen*, 110 Wn.2d 403, 411, 756 P.2d 105 (1988). Constitutional error occurs if there is no election and no unanimity instruction is given. *State v. Bobenhouse*, 166 Wn.2d 881, 893, 214 P.3d 907 (2009). The error stems from the possibility that some jurors may have relied on one act as the basis for convicting the defendant and other jurors may have relied on a different act, resulting in a lack of unanimity on all of the elements necessary for a valid conviction. *Kitchen*, 110 Wn.2d at 411.

However, an exception exists when the evidence shows the defendant was engaged in a "'continuing course of conduct.'" *State v. Handran*, 113 Wn.2d 11, 17, 775 P.2d 453 (1989) (quoting *Petrich*, 101 Wn.2d at 571). In this situation, neither an election nor a unanimity instruction is required. *Id.* In determining whether the evidence supports multiple criminal acts or a continuing course of conduct, this court evaluates the facts in a commonsense manner considering (1) the time that elapsed between the criminal acts; and (2) whether the different acts involved the same parties, the same location, and the same ultimate purpose. *State v. Love*, 80 Wn. App. 357, 361, 908 P.2d 395 (1996). "[W]here the evidence involves conduct at different times and places, then the evidence tends to show "'several distinct acts.'" *Handran*, 113 Wn.2d at 17. Importantly, when a defendant's actions constitute a continuing course of conduct, "a unanimous jury verdict would not be required as to each incident . . . during this short period of time; instead, the

7

jury would only need to be unanimous in its determination that the conduct occurred." *State v. Crane*, 116 Wn.2d 315, 330, 804 P.2d 10 (1991).

In *Handran*, Mr. Handran climbed through the window of his ex-wife's apartment, leaned over her, and kissed her while he was nude. *Handran*, 113 Wn.2d at 12. She asked him to leave, but instead Mr. Handran pinned her down and hit her in the face. *Id.* The State charged Mr. Handran by amended information with first degree burglary, but did not elect which assault was the predicate for the charge, and the jury was not given an instruction requiring it to be unanimous in determining a particular assault occurred. *Id.* at 12-13. The jury found Mr. Handran guilty, and Mr. Handran appealed. *Id.* at 13. After noting that Mr. Handran's alleged criminal conduct occurred in one place during a short period of time with the same victim and aggressor, the court concluded, "Under a commonsense evaluation of these facts, the actions evidence a continuing course of conduct to secure sexual relations with his ex-wife . . . rather than several distinct acts." *Id.* at 17. The court accordingly rejected Mr. Handran's argument that the trial court should have issued a unanimity instruction. *Id.* at 17-18.

Here, the evidence does not indicate that Mr. Tutu's attack on S.B. in her bedroom was a series of multiple distinct acts. While in S.B.'s bedroom, Mr. Tutu penetrated S.B.'s vagina with his finger and then subsequently penetrated S.B.'s anus with his penis.

Similar to the defendant's conduct in *Handran*, Mr. Tutu's criminal acts occurred moments apart, occurred in one location, and involved the same victim. Moreover, Mr. Tutu committed both acts to further the same ultimate purpose of achieving sexual gratification. Under a commonsense evaluation of the facts, Mr. Tutu's actions constituted a continuous course of conduct and, therefore, neither an election nor a *Petrich* unanimity instruction was required. We conclude that Mr. Tutu was not deprived of jury unanimity.

2.    *Whether the trial court erred in imposing discretionary LFOs*

Whenever a person is convicted, the trial court "may order the payment of a legal financial obligation" as part of the sentence. RCW 9.94A.760(1); *accord* RCW 10.01.160(1). By statute, the trial court is not authorized to order a defendant to pay costs unless he or she is or will be able to pay them. RCW 10.01.160(3). In determining the amount and method of payment of costs, the trial court shall take account of the financial resources of the defendant and the nature of the burden that payment of costs will impose. RCW 10.01.160(3). Accordingly, "a trial court has a statutory obligation to make an individualized inquiry into a defendant's current and future ability to pay before the court imposes LFOs." *Blazina*, 182 Wn.2d at 830.

9

Importantly, "the court must do more than sign a judgment and sentence with boilerplate language stating that it engaged in the required inquiry." *Id.* at 838. Therefore, "[t]he record must reflect that the trial court made an individualized inquiry into the defendant's current and future ability to pay."[4] *Id.* However, neither RCW 10.01.160 nor the Constitution "'requires a trial court to enter formal, specific findings regarding a defendant's ability to pay [discretionary] court costs.'" *State v. Lundy*, 176 Wn. App. 96, 105, 308 P.3d 755 (2013) (alteration in original) (quoting *State v. Curry*, 118 Wn.2d 911, 916, 829 P.2d 166 (1992)).

"The trial court's determination 'as to the defendant's resources and ability to pay is essentially factual and should be reviewed under the clearly erroneous standard.'" *State v. Bertrand*, 165 Wn. App. 393, 404 n.13, 267 P.3d 511 (2011) (quoting *State v. Baldwin*, 63 Wn. App. 303, 312, 818 P.2d 1116 (1991)). A finding of fact is clearly erroneous when, "'although there is some evidence to support it, review of all of the evidence leads to a "definite and firm conviction that a mistake has been committed."'" *Lundy*, 176 Wn. App. at 105 (quoting *Schryvers v. Coulee Cmty. Hosp.*, 138 Wn. App. 648, 654, 158 P.3d 113 (2007)).

---

[4] Although courts have little guidance regarding what counts as an "individualized inquiry," *Blazina* makes clear, at a minimum, the sentencing court "must also consider important factors . . . such as incarceration and a defendant's other debts, including

10

"A defendant who makes no objection to the imposition of discretionary LFOs at sentencing is not automatically entitled to review." *Blazina*, 182 Wn.2d at 832. Subject to three exceptions which do not apply here, RAP 2.5(a) provides that an "appellate court may refuse to review any claim of error which was not raised in the trial court." In *Blazina*, the Washington Supreme Court recently confirmed an appellate court's discretion under RAP 2.5(a) extends to review of a trial court's imposition of discretionary LFOs. *Blazina*, 182 Wn.2d at 834-35.

A.   *Whether this court should exercise its discretion under RAP 2.5 and review Mr. Tutu's unpreserved LFO challenge*

Under *Blazina*, each appellate court is entitled to "make its own decision to accept discretionary review" of unpreserved LFO errors. *Id.* at 835. Admittedly, the judges of this court are not in agreement as to what extent discretion should be exercised to review unpreserved LFOs. An approach favored by the author is to consider the administrative burden and expense of bringing a defendant to court for a new hearing, versus the likelihood that the discretionary LFO result will change. "An important consideration of this analysis is the dollar amount of discretionary LFOs imposed by the sentencing court." *State v. Arredondo*, No. 30411-6-III, 2015 WL 5511574, at *13 (Wash. Ct. App. Sept. 17, 2015).

restitution, when determining a defendant's ability to pay." *Blazina*, 182 Wn.2d at 838.

11

Here, the trial court imposed both mandatory and discretionary LFOs. The mandatory LFOs included the $500 victim assessment, $200 criminal filing fee, and the $100 deoxyribonucleic acid (DNA) collection fee. *See* RCW 7.68.035(1)(a); RCW 36.18.020(2)(h); RCW 43.43.7541. These mandatory LFOs are required irrespective of Mr. Tutu's ability to pay. *Lundy*, 176 Wn. App. at 103. However, the $4,248.54 special costs reimbursement, $2,100.00 court-appointed attorney fee, $250.00 jury demand fee, $147.12 witness fee, and $60.00 sheriff's service fee are all discretionary LFOs.[5] *See* RCW 10.01.160(2) (authorizing "expenses specially incurred by the state in prosecuting the defendant"); RCW 36.18.016(3)(b) (stating that a $250 jury demand fee *may* be imposed upon conviction). The discretionary LFOs equal $6,805.66. The trial court authorized "$50.00 per month to be taken from any income [Mr. Tutu] earns while in the custody of the Department of Corrections." CP at 42.

A new sentencing hearing is likely to change the LFO result. The trial court found that Mr. Tutu was indigent and thus qualified for publicly funded counsel both for trial and on appeal. He testified he fled from Sudan to the United States to escape the

---

[5] The trial court also imposed a $500 fine under RCW 9A.20.021. This division recently decided that a trial court may impose fines under RCW 9A.20.021 without inquiring into a defendant's ability to pay. *See State v. Clark*, 362 P.3d 309, 312 (2015); *see also State v. Calvin*, 176 Wn. App. 1, 25, 316 P.3d 496 (2013), *review granted in part, remanded*, 183 Wn.2d 1013, 302 P.3d 509 (2015).

12

Sudanese civil war, in which he was forced to be a child soldier. Although Mr. Tutu testified that he went to school when he first came to the United States when he was 12 years old, he never testified that he ever finished school, and there was no evidence he has any work history or job skills. He declared in an affidavit, "I am unemployed . . . I have no assets, no real property, no stocks, no bonds." Notice of Appeal, Aff. of Def. in Support of Motion for Order of Indigence. Therefore, considering both the likelihood that a new sentencing hearing would change the LFO result and the $6,805.66 in discretionary LFOs at issue here, this court concludes it should exercise its discretion under RAP 2.5(a) and review Mr. Tutu's unpreserved LFO challenge.

B.    *Whether the trial court erred in imposing $6,805.66 in discretionary LFOs without inquiring into Mr. Tutu's ability to pay*

Mr. Tutu contends that the trial court never checked the available box on the judgment and sentence indicating that "the defendant has the ability or likely future ability to pay the legal financial obligations imposed herein," and therefore the trial court erred in imposing discretionary LFOs.[6] CP at 40. The fact that the trial court did not check this box is wholly irrelevant for purposes of this appeal. While ability to pay is a

---

[6] Although the trial court did not check the box indicating that Mr. Tutu had the ability to pay, the fact that the trial court imposed discretionary LFOs indicates that this was likely a scrivener's error. The remedy for clerical or scrivener's errors in judgment and sentence forms is remand to the trial court for correction. *State v. Naillieux*, 158 Wn.

13

necessary threshold to the imposition of costs, "[n]either the statute nor the constitution requires a trial court to enter formal, specific findings regarding a defendant's ability to pay." *Curry*, 118 Wn.2d at 916. "The boiler plate finding is therefore unnecessary surplusage." *State v. Calvin*, 176 Wn. App. 1, 25, 316 P.3d 496 (2013), *review granted in part, remanded*, 183 Wn.2d 1013, 353 P.3d 640 (2015). However, what *is* required before a trial court imposes LFOs is an individualized inquiry *on the record. See Blazina*, 182 Wn.2d at 838.

Here, the record of the sentencing hearing does not reveal the presentation or consideration of any information about Mr. Tutu's present or future ability to pay. Moreover, Mr. Tutu never testified that he completed his education, has work experience, or has any other tenable basis for which LFOs might be imposed. Accordingly, the record does not show the trial court sufficiently considered Mr. Tutu's financial resources and ability to pay before it imposed $6,805.66 in discretionary LFOs. This court therefore remands this case to the trial court with instructions to conduct an individualized inquiry into Mr. Tutu's present and future ability to pay.[7]

---

App. 630, 646-47, 241 P.3d 1280 (2010).

[7] Mr. Tutu also argues that the trial court violated his due process rights by imposing arbitrary amounts of LFOs and there is no evidence in the record that provides a factual basis for these expenses or their relationship to this case. Because we determine that remand is appropriate, we elect not to review this issue as it may be moot.

No. 30801-4-III
*State v. Tutu*


Affirmed in part and remanded.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_____
Lawrence-Berrey, J.

I CONCUR:


_____
Fearing, J.

15

30801-4-III

SIDDOWAY, C.J. (dissenting in part) — Sifa Timas Tutu did not object when discretionary legal financial obligations were imposed at the time of sentencing. I would follow the general rule and decline to consider his challenge for the first time on appeal for the reasons set forth in *State v. Duncan*, 180 Wn. App. 245, 327 P.3d 699 (2014), *review granted*, 183 Wn.2d 1013 (2015) and in my concurring opinion in *State v. Munoz-Rivera*, 361 P.3d 182, 194-95 (2015). I otherwise concur in the majority opinion.

_____
Siddoway, C.J.